Filed 8/12/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SUSAN CHRIST et al., | D068579 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2013-00064575-CU-PA-CTL) |
| DWAYNE SCHWARTZ, | |
| Defendant and Respondent. | |

APPEAL from a judgment and an order of the Superior Court of San Diego County, Randa Trapp, Judge.  Affirmed.

Law Office of Rocky K. Copley and Rocky K. Copley, for Plaintiffs and Appellants.

Law Offices of Kim L. Bensen and Todd G. Glanz; Pollak, Vida & Fisher and Daniel P. Barer, for Defendant and Respondent.

Susan Christ (Susan)[1] sued Dwayne Schwartz for personal injury she allegedly suffered when Schwartz's automobile collided with her vehicle. Jon Christ (Jon), Susan's husband, also sued Schwartz for loss of consortium based on Susan's injuries. Despite Schwartz's stipulation that his negligence was the sole cause of the collision, the jury awarded no damages to Susan and Jon. The Christs appeal from the judgment contending that the trial court erroneously admitted photographs of the damaged vehicles and evidence of Jon's extramarital affair. They also appeal from the order denying their motion for a new trial. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Facts*

In October 2011, Schwartz drove his car at approximately 10 miles per hour around a bus and sideswiped the automobile driven by Susan. Susan was wearing a lap belt and shoulder harness. Her body did not strike anything inside her car, and the air bags did not deploy. Schwartz was not injured in the collision. After the accident, both drivers moved their vehicles to the curb. Susan ran up and down the street looking for witnesses. She told Schwartz that she was calling the police and continued seeking witnesses until police arrived. After a police officer responded and began taking information from Schwartz, Susan repeatedly interfered, stepping between Schwartz and the officer, even after the officer instructed her to stop interfering.

---

[1] We use the plaintiffs' first names for the sake of convenience. We intend no disrespect.

Jon, formerly an auto damage claims supervisor with GEICO insurance for 42 years, arrived at the scene of the accident while Susan was still there. Susan told Jon that she had pain in her shoulder, neck and back, but he did not suggest that she go to the hospital. Jon offered Susan a ride from the scene, but Susan declined and drove herself home.

The day after the accident, Susan visited her family physician, Gregory Babikian, and complained of neck and back pain. Dr. Babikian prescribed a muscle relaxant and physical therapy. However, a week and a half later, Susan began massage therapy twice a week for five to six weeks. Eventually, in January 2012, she started physical therapy. Between January 2012 and March 2012, she had eight sessions. She improved temporarily, but continued to complain of pain and stiffness in her neck. One year after the accident, Susan's only complaint was neck pain.

By June 2012, Susan was seeing a new family care physician, Fahime Lessani. Susan complained about ongoing pain and reduced range of motion. Dr. Lessani ordered x-rays and an MRI, which did not reveal any abnormalities. Dr. Lessani referred Susan to a rheumatologist, whom Susan consulted only once. Dr. Lessani prescribed more physical therapy, which provided improvement. Susan could not recall any treatment between October 2012 and August 2013.

In August 2013, Susan filed suit against Schwartz alleging negligence. In the same lawsuit Jon alleged loss of consortium. That same month Susan consulted another rheumatologist, Frank Kozin. Susan told Dr. Kozin that since the accident, she had

constant pain in her neck and upper back. He diagnosed her as suffering from the "residuals of whiplash injury that was going to be a permanent process."

In April 2014, defense medical expert Raymond Vance examined Susan. Dr. Vance found her to be completely normal neurologically, with no significant atrophy, and no loss of range of motion of the large joints of her upper and lower extremities. The only indication of injury from the accident stemmed exclusively from Susan's subjective complaint of neck and back pain after the accident.

Susan had a history of neck pain before the accident. In 2009, Susan was injured in a slip-and-fall accident injuring her shoulder, arm and knee or ankle, with shoulder pain radiating up her neck. She filed a personal injury claim based on this incident and eventually settled the case. Before 2009, Susan had filed a claim in a dog bite case involving injury to her hand. Susan also settled that case. Medical records from 2010 reflect a history of Susan having headaches with pain radiating into her neck and upper back, along with suffering from anxiety, depressive disorders, cervicalgia (neck pain), and facial pain. The records did not identify any organic pathology for the pain in Susan's neck and upper back.

Soon after Dr. Vance's examination, Susan wrote him a letter stating that she had underreported the frequency and intensity of her symptoms, and that actually she was in constant pain every minute of every day, even though during the examination she had told him that the pain was not constant. She also stated that she had difficulty with simple household chores and personal care, such as brushing her teeth and getting

4

dressed. She also wrote, "If you would like to clarify anything I've told you in this letter, please call my attorney."

After Dr. Vance's examination of Susan, and at about the same time she filed this case, Dr. Kozin added the diagnosis of fibromyalgia based on Susan's complaint of pain throughout her body. In Dr. Kozin's opinion, Susan's fibromyalgia constituted a permanent condition. He recommended periodic physical therapy as "beneficial," even though he stated "[i]t doesn't do anything for the treatment of fibromyalgia," but would instead help Susan get "more functional." He opined that Susan will need medical care for fibromyalgia for the rest of her life. Although Dr. Kozin recommended a drug protocol for Susan, she had not started drug therapy at the time of trial, eight months later.

Dr. Vance disputed the diagnosis of fibromyalgia because it was based on Susan's subjective complaints, which can easily be manipulated and cannot be objectively confirmed. All of Susan's complaints were similar to those she had made before the accident. In 2010, she reported headaches and pain radiating from her neck and upper back. She had also reported suffering from anxiety, a depressive disorder and cervicalgia (pain in the neck). The records did not identify any organic pathology for the pain in Susan's neck and upper back. In Dr. Vance's opinion, soft tissue injuries such as those Susan claimed usually resolve in days, weeks, or a matter of months. He also opined that soft tissue injury causes a chronic condition in less than one percent of the population, and that people who complain of such pain after an accident attribute those claims to the accident when the pain actually may stem from another cause.

The Christs testified that Susan's symptoms interfered with their relationship and made it impossible for them to participate in activities they had enjoyed, such as golf and walking. Susan also testified that since the accident she could not lift anything weighing more than five pounds. Jon testified that he could not touch certain parts of Susan's arms, shoulders, back or neck without causing her to jump, wince and pull back. According to Susan, if she does not first do yoga, she cannot wash her face or brush her teeth. Also she can no longer perform household services she used to regularly provide. Susan presented expert testimony that the future value of household services she can no longer provide was $192,561.

In contrast to the Christs' testimony regarding Susan's limitations, according to a defense investigator, as shown in a sub rosa video taken at the time of the trial, Susan lifted a large trash can and carried it along the driveway, picked up dogs, held a large handbag and bent at the waist without any apparent pain. Jon touched Susan's back without causing any negative reaction.

In his closing argument, in addition to requesting the $227,289 in damages for past and future household services, plaintiff's counsel asked the jury to award Susan pain and suffering damages between $855,000 and $1,995,000, based on 45 months for past pain and suffering and future life expectancy of 240 months at the rate of $3,000 to $7,000 per month. For future medical treatment for fibromyalgia, Susan's counsel calculated figures based on Dr. Kozin's testimony, of $15,960 for future doctor visits, $104,025 for medication, $27,360 for future opiate medication, totaling $147,345 for future medical

6

expenses. He also requested $75,000 for past loss of consortium on behalf of Jon, and $200,000 for future loss of consortium.

In his closing argument, defense counsel emphasized Susan's lack of credibility and contended that she was not injured in the accident. He did not directly mention Jon's extramarital affair but argued that there had been no loss of consortium because the accident had not altered Jon's marital relationship with Susan.

The jury voted eleven to one to award Susan zero dollars for past and future economic damages and voted unanimously to award zero dollars for non-economic damages and Jon's loss of consortium claim. A judgment in Schwartz's favor was entered.

The Christs' motion for new trial based on alleged errors in admitting photographs of the vehicles and evidence of Jon's affair, as well as the jury's inadequate award of damages, was denied.

B. *Trial proceedings*

1. Stipulations

The parties stipulated that Schwartz was negligent, that Susan was not comparatively negligent, that Schwartz's negligence was 100 percent the cause of the collision, and that Susan did nothing at the time prior to or during the course of the automobile collision to cause the injuries/damages that Susan and Jon are claiming in this litigation. In response to requests for admissions, Schwartz admitted that his negligence caused Susan to suffer "harm." The remaining issues were the nature and extent of Susan's "harm" and John's loss of consortium claims.

7

## 2. In limine motions

### a. *Introduction*

On appeal, the Christs contend that the trial court erred in denying the in limine motions to preclude the jury from viewing photographs of postcollision damage to the vehicles, and to preclude mention of Jon's extramarital affair that took place 14 years before trial, allegedly pertinent to Jon's loss of consortium claim. We conclude that the trial court did not abuse its discretion in admitting the evidence. In any event, any error was harmless because it was not reasonably probable that the granting of the two in limine motions would have changed the outcome of the case. All of the Christs' claims rested solely on the believability of Susan's subjective, uncorroborated testimony that the accident caused her personal injury. Because of the impeachment of her credibility, the jury reasonably rejected the Christs' claims.

### b. *Standard of Review*

"A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10) "When reviewing the sufficiency of evidence on appeal, as long as circumstances reasonably justify the fact finder's determination, we must accept it, even though another fact finder may have reasonably determined the opposite." (*People v. Rodriguez* (2000) 77 Cal.App.4th 1101, 1106.) Claims of evidentiary error under California law are reviewed for prejudice applying the "miscarriage of justice" or "reasonably probable"

8

harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, that is embodied in article VI, section 13 of the California Constitution. Under the *Watson* harmless error standard, it is the burden of appellants to show that it is reasonably probable that they would have received a more favorable result at trial had the error not occurred. (*People v. Watson*, at p. 836; Code Civ. Proc., § 475.)

        c. *Admissibility of Photographs of the vehicles taken after the accident*

Photographs of Susan's and Schwartz's vehicles were taken after the accident. Except for the fact that Schwartz pulled the apex of his fender and bumper out before his car was photographed, the photographs accurately reflect the condition of the cars after the accident. The photographs do not show any major damage to the vehicles.

The Christs moved in limine to prevent Schwartz from presenting photographs showing the condition of Susan's vehicle after the accident. They argued that without proper expert witness testimony to explain the relationship between damage to the vehicle and Susan's injuries, the jury could easily misinterpret the photographs. Schwartz responded that jurors could use their common experience to evaluate the photographs. He also contended that the photographs were relevant because Dr. Vance had relied on them in forming his medical opinion on causation. The trial court determined that the photographs were relevant to illustrate Dr. Vance's opinion relating to the injuries sustained in the collision.

### 1. Proper foundation

Relying on out-of-state authority,[2] the Christs contend that in the absence of foundational expert testimony of biomechanical experts, the postaccident photographs of the vehicles involved in the collision invited the jury to speculate on the relationship between visible damage to the plaintiff's vehicle and actual impact on its occupant. They also contend that absent any reported California case on point,[3] this court should follow a ruling of the Delaware Supreme Court in *Davis v. Maute* (Del. 2001) 770 A.2d 36, 40 (*Davis*), which states that without foundational expert testimony, a jury cannot be allowed to correlate physical damage to cars involved in a collision with injury to the cars' occupants. However, *Davis* has been strictly limited by the Delaware Supreme Court to allow jurors to consider photographs of vehicles involved in accidents without expert testimony when a court permits. (*Eskin v. Carden* (Del. 2004) 842 A.2d 1222, 1231-1233 (*Eskin*). In *Eskin* the Delaware Supreme Court stated: "*Davis* does not hold that photographs of the vehicles involved in an accident may never be admitted without expert testimony about the significance of the damage to the vehicles shown in the accident and how that damage may relate to an issue in the case. *Davis* has been

---

2    California courts are not bound by out-of-state authorities. (*In re Establishment of Eureka Reporter* (2008) 165 Cal.App.4th 891, 899.)

3    The Christs contend that the lack of California authority on the requirement of a foundation of expert biomechanical testimony for jury consideration of photographs of vehicles damaged in a collision reflects the insurance industry's concerted effort to avoid an adverse appellate ruling on this question.

misinterpreted as a bar to the admission of photographs without expert testimony. It was only [defense counsel's] disingenuous reference to a 'fender bender'—after a trial judge's express ruling forbidding what that phrase implied—that prompted our holding. *Davis* should not be construed broadly to require expert testimony in every case in order for jurors to be permitted to view photographs of vehicles involved in an accident." (*Id.* at p. 1233.)

In any event, we agree with the majority of state courts, which have held that the admission of photographs of vehicles involved in a collision without supporting expert testimony is within the trial judge's discretion. (*Mason v. Lynch* (Md. 2005) 878 A.2d 588, 595-600 [Opinion by the Maryland Court of Appeals, the state's highest court, which based its opinion on a survey of multiple jurisdictions.]; see, e.g., *Murray v. Mossman* (Wash. 1958) 329 P.2d 1089, 1091 [Supreme Court of Washington allowed photographs of vehicular damage in an admitted liability case because the photographs and the testimony concerning them tended to show the force and direction of the impact that resulted in injuries to the claimant.]; *Brenman v. Demello* (N.J. 2007) 921 A.2d 1110, 1111, 1118-1119 [Supreme Court of New Jersey held that expert testimony is not required as a condition precedent to the admission of photographs of vehicle damage when the cause or extent of plaintiff's injuries is in issue. "Juries are entitled to infer that which resides squarely in the center of everyday knowledge; the certainty of proportion,

and the resulting recognition that slight force most often results in slight injury, and great force most often is accompanied by great injury."].)[4]

The majority rule, which allows trial courts to permit jurors to consider photographs of vehicles damaged in a collision without a foundation based on expert testimony, rests on the same general principle recognized in California that a trial judge's determination of admissibility of photographic evidence rests in the court's sound discretion and will not be disturbed unless plainly arbitrary. (*People v. Allen* (1986) 42 Cal.3d 1222, 1256.) A trial court has discretion to determine whether evidence on a subject may be shown to a jury without supporting expert testimony because the subject is not " 'sufficiently beyond common experience that the opinion of the expert would assist the trier of fact.' " (*Sanchez v. Brooke* (2012) 204 Cal.App.4th 126, 138 [No expert testimony is required when a subject is "within the realm of common knowledge."]; see also *Raven's Cove Townhomes, Inc. v. Knuppe Development Co.* (1981) 114 Cal.App.3d 783, 797 [Lay persons able to determine whether there were defects in landscaping, paint, and exterior trim without the aid of experts because the matters were not beyond common experience.].) Further, nothing prevented Susan from calling her own expert witness to explain that despite outward appearance of minor physical damage to her vehicle, the collision caused Susan's injury.

---

4      See also various cases from other states adopting the majority position: *Accetta v. Provencal* (R.I. 2009) 962 A.2d 56, 61-62 [rejecting *Davis* and its reasoning]; *Ferro v. Griffiths* (Ill. App.Ct. 2005) 836 N.E.2d 925, 930 ["[W]e refuse to adopt a rigid rule that proscribes the admission of pictures without an expert."]; *Flores v. Gutierrez* (Ind. Ct.App. 2011) 951 N.E.2d 632, 637-639; *Marron v. Stromstad* (Alaska 2005) 123 P.3d 992, 1009 [declining to adopt Davis's "rigid approach" requiring expert testimony].)

## 2. Evidence Code section 352 objection

A trial court's discretion to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value. (*People v. Allen*, *supra*, 42 Cal.3d at p. 1256.)

In a corollary argument, the Christs contend that under Evidence Code section 352 the photographs were more prejudicial than probative because the appearance of physical damage to the vehicle was unrelated to the actual force on the occupants, which they contend could only be explained by an expert. However, Susan presented no evidence to demonstrate that the photographs of the vehicles were prejudicial.[5] As we have noted, expert testimony is not always required before a jury can view photographs of vehicles involved in a collision. This is because a jury is ordinarily quite capable of correlating outward appearance of damage with likelihood and extent of injury. (See *Brenman v. Demello*, *supra*, 921 A.2d at pp. 1118-1119.) Therefore, without expert foundational testimony, the trial court can allow the jury to view the photographs based on its determination that the likelihood of prejudice from jurors is slim.

The Christs also dispute the relevance of the photographs because Schwartz admitted liability and they did not claim property damage. However, even where, as in this case, liability for an auto accident is admitted, evidence on how the accident

---

[5] For the first time on appeal, Susan cited various publications to support her contention that there is no necessary correlation between extent of property damage and resulting injury to an occupant of a damaged vehicle. However, publications that are not a part of the trial record cannot be considered on appeal. (See *Pulver v. Avco Financial Service* (1986) 182 Cal.App.3d 622, 631-632.)

13

happened is probative to show the force of the collision, which is an indicator of injury or lack thereof to passengers in the autos. (*Martin v. Miqueu* (1940) 37 Cal.App.2d 133, 137.)

Moreover, the photographs were probative to illustrate the witnesses' testimony of the side impact nature of the collision. (See *Murray v. Mossman*, *supra*, 329 P.2d at p. 1091.) Further, they were relevant to impeach Jon's credibility. In deposition testimony read at trial, Jon described extensive damage to Susan's car, including a headlight that appeared to be "hanging loose." However, when shown the photograph of Susan's vehicle at trial, Jon had to admit that the light "wasn't actually dangling, but it was broken and out of place." In addition, the photographs assisted Dr. Vance in formulating his opinion about the nature and extent of Susan's injuries. A trial court has discretion to admit materials on which an expert relies. (See Evid. Code, § 802 [expert may describe materials on which expert relies]; *People v. Nicolaus* (1991) 54 Cal.3d 551; 582-583.)

d. *Admissibility of* e*vidence of Jon's extramarital affair*

Susan filed an in limine motion to exclude evidence of Jon's extramarital affair as not relevant under Evidence Code section 350, and unduly prejudicial under Evidence Code section 352. Jon had a six-month extramarital affair in 1997. Ten years later, during a medical visit, when a nurse practitioner asked Susan about stress in her life, Susan responded that her daughter was having problems (her daughter's boyfriend was diagnosed with a serious illness), and volunteered that if she survived her husband's affair, she could survive anything. Susan contended that since the affair took place in

14

1997, it was remote in time and not relevant and that the prejudicial value of the evidence outweighed any probative value. Schwartz objected to the granting of the in limine motion contending that it was premature and that the history of the relationship was relevant. The trial court tentatively ruled that evidence of John's affair would be admissible, but that all motions in limine were "subject to being revisited at any time during the trial as the evidence is developed."

At trial, initially defense counsel touched briefly on the subject of the affair. After Susan testified that she was happy in her 45-year relationship with Jon, defense counsel asked Susan whether she had stated during a medical visit that she ignored Jon's indiscretions. Susan's counsel did not object to the question. Susan asked defense counsel to repeat the question, who then asked a different question about treatment for a prior neck and upper back injury. Not responding to that question, Susan volunteered, "afraid you were going to bring this up . . . as if it has anything to do with my injury. So I'll answer that, and I'll try to compose myself." As defense counsel began to ask another question, Susan interrupted and stated, "Because most women would leave their husbands." Defense counsel started to reframe the question about neck injury, but before he could complete the question, Susan stated, "Wrong." The trial judge commented on the sensitivity of the subject and stated that only one party could speak at a time. With no question pending, Susan stated, "I resent it." The judge stated that counsel needs an opportunity to ask questions. Susan queried, "About my entire life?" The trial judge inquired if Susan needed to take a minute to step down, and Susan agreed. As she was leaving the courtroom, Susan stated, "How dare you. How dare you." The court then

took a 10-minute break.  When trial resumed, defense counsel questioned Susan about taking medications and did not mention the subject of Jon's infidelity.  However, later in the cross-examination Susan initiated a discussion on the topic of her husband's infidelity.[6]  Defense counsel then inquired about her physical sensitivity to Jon's touches.  Next, he asked if everything was fine in their relationship.  Again, Susan spontaneously interjected the subject of infidelity not necessarily called for by the question.  Susan volunteered, "Oh, so happiness is just physical relationship?  Is that what you're intimating?  Is it just physical?  My husband found out that that's not what it is.  If you want to just go have a physical relationship, then you just go screw someone. Pardon me.

---

[6]      "Q: [by defense counsel] And if the record the day after this accident, the report from Dr. Babikian, says absolutely nothing about massage therapy, would that surprise you?

A:  [by Susan] Yes.  [Objection overruled by court.]

A:  If he didn't document it, I—I'm not responsible for what he documents.  *But I will say that I'm going to address the issue of the nurse discussing my husband's infidelity because that should not have been in the medical record.*  (emphasis added.)

[¶] . . . [¶]

Q:  It has nothing to do with this case or your loss—

A.  Absolutely—How dare you.

Q.  Does your relationship before this accident, ma'am, have anything to do with it afterwards from this accident?

A.  I'm not going to answer you.

Q.  Do you think it unfair, ma'am, for me to ask you questions about the state of your relationship before this accident?

A.  I sure do.  I take exception to the fact that you would ask me about my husband's infidelity, which did not belong in a medical record, which you never would have known about if that nurse had known better.  Because it was not my reason for my being there.  My reason for being with her had to do with my cardiac issues and the fact that I was dealing with my daughter's issue.  And we were talking casually.
[My daughter] had just started dating someone. And I told her, if I can get through my husband's infidelity and what I went through, if my marriage could survive that and made our marriage stronger.  [¶] I could talk about it, but not in front of strangers."

He found out real fast that's not what it's about. We went on a retreat. And the fact that we're together is, quite frankly, a miracle. We went to [a retreat] if you need to know, and it was about forgiveness." Next, defense counsel asked a few seemingly innocuous follow-up questions[7] and moved on to another topic.

On redirect examination, Susan's counsel engaged her in a detailed discussion of Jon's infidelity. Susan testified that the affair lasted six months, and that she made Jon tell their kids about it because she was so upset. She and Jon went to counseling through their church, and she forgave him. Since then, they have renewed their marriage vows twice. Susan recounted her conversation with the nurse about stress to explain how the reference to Jon's affair found its way into the medical records.

On appeal, Susan contends that the trial court committed reversible error in allowing evidence of the affair. However, the trial court had indicated before presentation of any evidence that its ruling allowing the evidence was tentative and subject to being revisited at the time of trial. During trial, Susan did not renew her objection to questions about Jon's affair. When a court has not finally ruled on an in

---

[7] "Q. Has he been supportive?
A. Very.
Q. And this accident caused that to go out the window, or he has been supportive?
A. Our physical relationship has suffered. Now you know.
Q. The issue with your husband's indiscretions where you saw [a nurse practitioner] that was 2007; is that correct?
A. Oh, we're still going to talk about this?
Q. I thought you wanted to talk about it more. Was that—
A. Go ahead. Let me brace myself.
Q. Was that 2007, Ma'am.?
A. Yes."

17

limine motion, as in this case, Evidence Code section 353 requires a timely objection during presentation of the evidence at trial to preserve the issue on appeal.[8] By failing to object during trial to admissibility of the evidence on the grounds advanced in the in limine motion, Susan and Jon failed to preserve the issue for review on appeal.

In any event, the court did not abuse its discretion in allowing the testimony. By claiming loss of consortium and emphasizing the strength of their relationship to support their claim, Susan and Jon put their entire marital relationship at issue and represented that it was totally fine. Consequently, evidence of the extramarital affair was relevant to Jon's claim for loss of love, companionship, comfort, affection, society, solace, moral support or the enjoyment of sexual relations. (See CACI 3920; *Morales v. Sup. Ct.* (1979) 99 Cal.App.3d 283, 288.) Evidence of an affair that took place many years ago may or may not be relevant to a loss of consortium claim. (*Ibid.*) In this case, four years before trial, Susan brought up her previous marital difficulties at a medical examination. Under these circumstance, the court did not abuse its broad discretion in determining that this subject matter was potentially relevant and thus appropriate for jury consideration.

> e. *The Christs' claim of prejudice based on jury's failure to award any damages*

---

[8]  "Events in the trial may change the context in which the evidence is offered to an extent that a renewed objection is necessary to satisfy the language and purpose of Evidence Code section 353 . . . '[U]ntil the evidence is actually offered, and the court is aware of its relevance in context, its probative value, and its potential for prejudice, matters related to the state of the evidence at the time an objection is made, the court cannot intelligently rule on its admissibility.' " (*People v. Morris* (1991) 53 Cal.3d 152, 190.)

The Christs contend that because Schwartz admitted liability and causing "harm," the jury's failure to award damages indicates they must have been prejudiced by the erroneous admission of the photographs of the vehicles and mention of Jon's affair. They suggest that because Schwartz admitted in response to an interrogatory that Susan suffered "harm," the jury was required to award some monetary compensation for her pain and suffering and future medical expenses. However, Schwartz only admitted causing "harm," but did not admit causing any of the specific damages Susan claimed. "Harm" is an amorphous term that could apply to property damage or past medical expenses, neither of which Susan claimed at trial.[9]

Thus, despite the stipulations and admission of "harm," Susan was essentially left with a stipulation of liability. Stipulations of liability do not automatically entitle plaintiffs to damages. (See e.g. *Nelson v. Black* (1954) 43 Cal.2d 612, 613-614 (*Nelson*); *Vogt v. McLaughlin* (1959) 172 Cal.App.2d 498, 502 ["But the rule is clear that a defense verdict may be returned even where liability is admitted, if the evidence would sustain a conclusion that the plaintiff's injuries were not proximately caused by the events sued upon."].) Susan still needed to prove that the accident caused her to incur household expenses, to suffer noneconomic damages and to require future medical expenses. (See CACI 3901.) Lacking objective proof of her injury, her entire claim was subjective and

---

[9] Susan sought only general damages for pain and suffering, damages for future medical expenses and loss of ability to provide household services caused by the accident. Jon's claim for loss of consortium required Susan to prove her claim. (CACI 3920 [Loss of consortium claim requires the claimant's spouse to prove her claim against the defendant.])

19

rested solely upon her credibility, which was materially impeached at trial. For example, she claimed that she was so seriously injured in the accident that she could not lift items heavier than five pounds and that Jon could not touch her in her upper body without causing pain and causing her to jump. She also testified that unless she first does yoga, she cannot wash her face or brush her teeth. However, the defense presented convincing impeachment evidence, including a sub rosa video taken prior to trial, showing Susan lifting and carrying a trash can, holding a large handbag, and bending at the waist without causing any apparent pain. It also showed Jon touching Susan's back without causing her any noticeable discomfort. Susan also impeached her own credibility when she told Dr. Vance the day after he examined her, that what she reported to him was not correct, i.e., that she had significantly underreported the frequency and intensity of her pain, and that she was in constant, not intermittent, pain and could no longer perform simple household chores or brush her teeth.

Additional evidence could also have led the jury to conclude that Susan suffered no injury. Her lack of injury was corroborated by medical testimony showing no objective manifestation of injury in x-rays or MRIs, and by her admissions that she did not bump against any objects during the collision, her vehicle's air bags did not deploy, her ability to drive home after the accident, and by her failure to request medical help at the scene. Further, when asked on cross-examination about her past medical treatment, Susan was evasive, repeatedly answering, "I don't remember." Given her pre-accident history of various health issues, the jury could have reasonably determined that she was

20

not candid about acknowledging past conditions that may have caused her current complaints.

After receiving some diagnostic care and treatment, Susan did not receive medical care for almost one year before filing suit. However, the month she did file suit, she began treating with Dr. Kozin, who eventually diagnosed her with fibromyalgia. She consulted Dr. Kozin only after rejecting another rheumatologist as her physician. A jury could reasonably conclude that when she filed suit, she searched until she found a physician willing to validate her reports of chronic pain. We also note that Susan based her claims for future medical expenses on suffering from fibromyalgia, which was based exclusively on her subjective complaints, which remained undiagnosed until she filed suit after a long hiatus with no medical treatment. The jury could also have considered that although Dr. Kozin prescribed medication to treat Susan's fibromyalgia, Susan did not take the medication. Under these circumstances, the jury could have reasonably believed Dr. Vance's testimony that Susan did not suffer from fibromyalgia, or if she did suffer from fibromyalgia, it was not as a result of the accident.

Based on this convincing impeachment of Susan's testimony, a jury could have reasonably rejected her entire testimony as not credible and have concluded that she, like Schwartz, was not injured in the accident. (See *Halagan v. Ohanesian* (1967) 257 Cal.App.2d 14, 21 ["[T]he trier of fact may disregard all of the testimony of a party, whether contradicted or uncontradicted, if it determines that [she] testified falsely as to some matters covered by [her] testimony."] A jury may conclude that a plaintiff who testifies falsely concerning injuries suffered no injuries. (*Carruthers v. Cunha* (1955)

21

133 Cal.App.2d 91, 96 [Upholding a defense verdict in an admitted liability case because plaintiff lacked credibility.].)

Finally, even assuming that the court erred in admitting evidence of the photographs of the vehicles and evidence of the affair, reversal is not warranted unless it resulted in a miscarriage of justice. (Cal Const. Art. VI, § 13; Evid. Code, § 353, subd. (b).) Prejudice is not presumed. (Code Civ. Proc., § 475.) Rather, appellant has the burden of affirmatively demonstrating prejudice. (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069.) A "miscarriage of justice" will be declared only where the appellate court, after examining all the evidence, is of the opinion that " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

Based on the totality of evidence in this case, the photographs of the damaged vehicles and the testimony concerning marital infidelity were tangential to the main question of the credibility of Susan's claims of injury. The Christs' entire case rested upon the believability of Susan's subjective, uncorroborated statements, which the jury rejected. Based on the abundant evidence unrelated to the vehicles' photographs or to Jon's affair, which significantly impeached Susan's credibility, it is unlikely that exclusion of the contested evidence would have changed the outcome of the case. (See *Cassim v. Allstate Insurance*, *supra*, 33 Cal.4th at p. 800; *Carruthers v. Cunha*, *supra*, 133 Cal.App.2d at p. 96 [Upholding a defense verdict in an admitted liability case because the jury logically concluded that plaintiff testified falsely concerning his injuries.]; see also *Nelson v. Black*, *supra*, 43 Cal.2d at pp. 613-614 [Admitted liability

22

case where the claims of injury were subjective and the jury properly refused to award damages because they did not believe he suffered injury.].)

In summary, each of the Christs' claims depended on the credibility of Susan's testimony that she suffered personal injury as a result of the accident with Schwartz. The jury reasonably found her testimony not credible and therefore properly rejected each of the Christs' claims.

## DISPOSITION

The judgment and order are affirmed. Schwartz is entitled to his costs on appeal.

PRAGER, J.[*]

WE CONCUR:

McCONNELL, P. J.

AARON, J.

---

[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.