Filed 3/21/23 P. v. Flores CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAVIER FLORES, JR.,<br><br>    Defendant and Appellant. | F083312<br><br>(Kings Super. Ct. No. 19CMS4857)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County. Michael J. Reinhart, Judge.

Spolin Law, Aaron Spolin, and Jeremy M. Cutcher for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant and defendant Javier Flores, Jr. was convicted of two counts of lewd acts upon a child under the age of 14 years and attempt to commit lewd acts upon a child under the age of 12 years. The trial court sentenced defendant to prison for a determinate term of nine years. On appeal defendant contends reversal is required because the trial court excluded any family court documents without proof of a hearsay exception. Defendant also argues the trial court appeared to be unaware of its discretion to impose nonconsecutive sentences such that he must be resentenced.

## FACTUAL BACKGROUND

Confidential victim (C.V.) was 16 years old at the time of her trial testimony. Her father was defendant, and she lived with him until two years earlier. C.V. now lived with her mother, four siblings, grandparents, and uncle. She described her relationship with defendant as "very unusual" due to him inappropriately touching her on multiple occasions. The first incident occurred when she was five years old. Defendant called C.V. to his bedroom and lifted her shirt before touching her bare chest. She believed he touched her chest for less than three minutes, but she could not recall if he touched her anywhere else.

The next incident occurred after C.V.'s parents had separated, and she was either 10 or 11 years old at the time. C.V. was at defendant's home when he called her to his bedroom. Defendant had C.V. lie with him under a blanket, but she eventually ended up on top of his crotch. Defendant lifted her shirt and started touching and licking her breasts. C.V. became scared when defendant started getting an erection, and she told defendant that she wanted to check on her siblings. She went to the bathroom to clean her underwear because she had an orgasm. Her mother picked up C.V. and her siblings later that day, and she remembered defendant looking at her weird. C.V. believed defendant was afraid that she would tell her mother, but she did not tell her mother until years later.

2.

C.V. also remembered a time where defendant called her into the living room to lie with him at 10 or 11 years of age. Defendant and C.V. faced each other on the couch by themselves; C.V. described the contact as cuddling. She was not comfortable because of his prior inappropriate touching, but she did not feel anything while her legs were around his legs. C.V. became upset during a separate occasion where he made an inappropriate remark while they were leaving the mall. C.V. stated she was hungry, and defendant told C.V. that "[defendant] was horny too." She informed defendant that she did not say "horny", and she could not recall any further discussion afterwards.

C.V. recalled another incident that occurred during a camping trip when she was 11 or 12 years old. She was lying in defendant's sleeping bag early in the morning when he began touching her chest. C.V. felt defendant's erection on her back, but she did not remember what happened afterwards.

C.V. first told her mother about defendant's inappropriate touching when she was 14 years old. She decided to tell her mother because she was afraid that defendant would inappropriately touch a child he was planning to have with another woman. C.V.'s mother informed C.V. about how she was touched inappropriately when she was younger. C.V. asked her mother if she was upset that no one noticed what was going on because C.V. felt that way.

At the time of C.V.'s disclosure, defendant and C.V.'s mother were divorced, and the parents shared custody of C.V. and her siblings. Defendant and C.V.'s mother began living separately in March 2016 due to her mother's discovery that defendant cheated on her. C.V. was initially upset when she learned that her parents were splitting up, but she became happy once she realized that it would get her away from defendant. She blamed her parent's divorce as the reason defendant began touching her. C.V. could not remember a time that she and her aunt, R.R., tried to use a cell phone to record defendant to gather proof that defendant was cheating on C.V.'s mother. When she was 14 years old, C.V. wrote in a journal about being upset that defendant cheated on her mother. She

3.

wrote in a different journal about defendant touching her when she was older, but she lost that journal. C.V. wanted to spend time with defendant after he touched her inappropriately because she still loved defendant.

C.V.'s mother encouraged her and her siblings to have a good relationship with defendant, and C.V. wanted a normal relationship with defendant. C.V. told her sister that someone touched her without going into detail, but she was too afraid to tell any adults. C.V. was worried that their family needed defendant, and no one would believe her. C.V.'s sister recalled not believing C.V. at first because she seemed like a "really happy person." Her sister only recalled C.V. telling her that "something bad happened to her," and the conversation occurred when C.V. was 13 or 14 years old. C.V. told her sister not to tell anyone, and C.V.'s sister tried to encourage C.V. to tell their mother. There was nothing that C.V.'s sister ever noticed as inappropriate conduct between defendant and anyone else. C.V.'s sister could not remember her mother being upset at defendant through the time of their divorce.

Defendant's former spouse and mother of C.V., Lisa F., recalled the time C.V. kept insisting they go for a drive in August 2019. Lisa began driving C.V. and her brother to a park, and she eventually pulled the car over once she noticed C.V. becoming nervous and scratching herself. C.V. started repeating that somebody did something to her, and Lisa asked her to explain. C.V. then yelled out, " '[M]y dad did something to me.' " Lisa asked for further clarification, and C.V. told Lisa that defendant touched her when she was five years old. Lisa wanted C.V. to know that she believed C.V. so she told C.V. that she went through something similar when she was younger. C.V. told Lisa that she did not inform her of the inappropriate touching earlier because she thought Lisa would be mad at her.

The divorce between defendant and Lisa had already been finalized, and the parents shared 50/50 custody of the children at the time of C.V.'s disclosure. The cause of defendant and Lisa's divorce was infidelity by defendant. Lisa tried not to let the

children see her upset, and she did not tell the children about the reasons for the divorce. The children were encouraged by Lisa to communicate and spend time with defendant, and she did not resent the amount of time that defendant spent with the children. Lisa did not have difficulty with the legal process of the divorce, but she admitted to having a "difficult time" when she found out about defendant's infidelity in January 2016.

Lisa acknowledged that she attempted to harm herself when she and defendant were splitting up. She got a knife from the kitchen and began to cut her wrist with the knife when defendant would not disclose the identity of the woman with whom he had cheated. The children were inside the home at the time, and C.V. became upset when she learned about Lisa's attempt to harm herself.

Dr. Anthony Urquiza, a licensed psychologist and director of a child abuse program, testified as an expert on Child Sexual Abuse Accommodation Syndrome (CSAAS). CSAAS was developed to educate therapists and dispel certain myths about victims of sexual abuse. The characteristic of secrecy within CSAAS is explained by two preconditions. The preconditions are children being sexually abused by somebody they have an ongoing relationship with and having less power, size, and knowledge than their abuser. The child develops a perception that something bad would happen if they disclosed the abuse.

The factor of helplessness within CSAAS is used to counter the misperception that a victim will do something to keep themselves safe when their abuser approaches them. When a parent is the person abusing a child, the child's ability to keep themselves safe does not really exist due to the enormous amount of control the parent has over their life. Another factor involved the delay in disclosure and the misperception that a victim would disclose any abuse right away. Dr. Urquiza acknowledged that CSAAS does not provide a definitive way to conclude that a child is a victim of sexual abuse.

There was no research indicating a person could effectively coach a child to make a false allegation of sexual abuse. Dr. Urquiza had not received any information about

5.

the facts of defendant's case. He was aware of an article from the mid-1980s in which two doctors discuss issues related to false allegations of sexual abuse. Dr. Urquiza could not answer a question from defendant's counsel regarding a statement from the article noting an increased number of sexual abuse allegations in contested custody cases.

***Defense Case***

The defendant's sister, R.R. is four months younger than C.V., and they used to be as close as sisters. In the summer of 2016, R.R. noticed that Lisa was sad, and C.V. informed R.R. that defendant cheated on Lisa. R.R. suggested that she and C.V. try to record defendant talking on the phone in order to obtain proof of his cheating. They placed a cell phone on defendant's dresser and retrieved the phone on the following morning to listen with Lisa. The recording revealed defendant talking to a woman, and Lisa appeared angry and upset. R.R. and C.V. communicated regularly until August 2019, but R.R. had not spoken to C.V. since then. C.V. never told R.R. about defendant touching her inappropriately, and she did not believe C.V. R.R. continued to speak regularly with defendant after C.V.'s disclosure of abuse. Defendant's mother testified that Lisa was sad during their separation because defendant had been unfaithful to her.

Defendant first met Lisa in high school, and they got married after Lisa became pregnant with C.V. Their relationship became "rocky" when they started to separate. Defendant described Lisa's attitude as confrontational, angry, and emotional when she first accused him of cheating on her prior to their separation. He recalled the incident where Lisa tried to harm herself in May 2016. Defendant claimed she tried to stab herself after he told her that he no longer wanted to be in a relationship with her. Lisa and defendant wrestled over the knife before other family members arrived to help restrain her.

Defendant and Lisa separated in March 2016, and custody proceedings began in March 2018. Lisa filed a petition requesting 100 percent legal custody and 75 percent physical custody in February 2019. The divorce was finalized around May 2019, and the

6.

final order provided for 50 percent legal and 50 percent physical custody was completed after discussions with a mediator. In the summer of 2019, Lisa reportedly told defendant that she was not satisfied with the shared custody order and wanted more time with the children. The trial court sustained no objections to exclude father's testimony regarding the family law case. Defendant denied the allegations that he ever touched C.V. in an inappropriate manner.

Defendant believed Lisa wanted to change the custody orders to allow her to move to Salinas for new employment. Lisa never filed formal paperwork to change the custody order, but defendant was prohibited from seeing his children due to a restraining order granted two years before his trial.

## DISCUSSION

### I.     Admissibility of Evidence

Defendant contends the trial court erred in not allowing documents from defendant and Lisa's family law case into evidence. Defendant argues that the trial court's intent to limit the scope of questioning regarding the family law case depending on its probative value resulted in prejudicial error. The People respond that defendant's claim is forfeited and lacks specificity, and they also argue that any such error was harmless.

#### A.     *Procedural Background*

On the first day of trial, defendant's counsel brought up the prosecution's concerns with referencing the family law case involving defendant and Lisa during opening statements as a motion in limine. Defendant's counsel indicated it was only his intention to make reference to the existence of the family case and the divorce. He had no intention to present particular court documents from the family law case, but he did plan to introduce firsthand knowledge of a messy divorce from defendant's perspective. The trial court stated it would address the issue while the jurors complete their questionnaires.

The trial court held an informal conference regarding defendant's request to reference the family law case. Defendant's counsel made an offer of proof that those

7.

proceedings were a basis to fabricate the sexual abuse allegations. The trial court reserved a final ruling on the admissibility of the information, and it acknowledged that it appeared to be relevant. No ruling was to be made until after any documents were provided to the prosecution by defendant's counsel.

On the following day, the trial court addressed the motion in limine prior to the beginning of opening statements. The prosecutor acknowledged receipt of a court minute order regarding a domestic violence temporary restraining order from November 22, 2019. The restraining order prevented contact between defendant and his children. The restraining order was filed subsequent to the family's initial dissolution, which was finalized in 2018 with 50/50 custody according to an agreement between defendant and Lisa.

The trial court summarized the defense's theory that Lisa became dissatisfied with the original agreement for shared custody of the children and facilitated the sexual abuse allegations, which resulted in an unfavorable change in custody for defendant. Defendant's counsel agreed with the trial court's understanding of the defense's theory. In its ruling on the admissibility of the evidence the trial court reasoned as follows:

> "In the main it is relevant, and to the credibility and motivation of the complaining witness and victim. [¶] What is going to be excluded is any court documents that were filed by any party and no court orders. Any physical documents in that case are excluded at this time, they contain multiple items of hearsay, probably multiple levels of hearsay. [¶] Now I'll revisit that if either side wishes to introduce a portion of that document and can establish a hearsay exception. [¶] As I understand [defendant's counsel's] offer of proof, he intended to discuss the matter in cross-examination with the spouse and with the victim and then possibly in direct, should his client take the stand."

Defendant's counsel responded, "Precisely, your honor." The trial court then admonished the parties that it did not want to relitigate the family law case during the trial, and it would consider the defense's theory as it was weighing objections under Evidence Code section 352. The prosecution objected under Evidence Code section 352

based upon the lack of evidence that Lisa was seeking to change custody orders prior to the allegations having been made. The trial court affirmed that it had excluded documents so the issue would have to be raised through Lisa or defendant's testimony, and it added, "[W]e will take that up as it comes."

## B. *Applicable Law and Standard of Review*

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless some exception to the hearsay rule is satisfied. (*Id.*, subd. (b).) Several exceptions to this rule exist, including one that permits "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation" when "offered to prove the declarant's state of mind … when it is itself an issue" (*id.*, § 1250, subd. (a)(1)) or "offered to prove or explain acts or conduct of the declarant" (*id.*, subd. (a)(2)) provided the proffered statement is sufficiently trustworthy (*id.*, § 1252). Further, statements not offered for the truth of the matter asserted, but rather used circumstantially to demonstrate some other point such as the declarant's mental state, are not excluded by the hearsay rule. (See 1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, §§ 38, 40, pp. 831–835.)

"We review the trial court's rulings regarding the admissibility of the evidence for an abuse of discretion." (*People v. Mataele* (2022) 13 Cal.5th 372, 413.) "A trial court's decision to admit or exclude evidence ' " 'will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice' " ' … '[and w]e presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise.' " (*Id.* at pp. 413–414.)

## C. *Analysis*

As an initial matter, the People argue defendant forfeited his argument that the trial court erred by failing to seek the admission of any family court documents. Prior to

trial, defendant's counsel indicated his plan to make reference to the family law case involving defendant, Lisa, and C.V. through "firsthand knowledge." Defendant's counsel clearly stated that he did not plan to present particular court documents from the family law case.

The trial court ruled that defendant would be allowed to discuss the family law matter in cross-examination with Lisa and direct examination with defendant. Although defendant's counsel made no specific request to introduce any family court documents either before or during trial, the trial court excluded any such documents as hearsay. The trial court would revisit its ruling to exclude any family court documents if either side wished to introduce a portion of the document and establish a hearsay exception. It also cautioned defendant's counsel that it did not want the family law case relitigated during the trial, but it would keep defendant's theory in mind as it weighed Evidence Code section 352 objections.

Although the trial court invited defendant to revisit the issue of admission of any family court documents by establishing a hearsay exception during trial, defendant did not do so. Where the trial court had not finally ruled on an in limine motion, a timely request during the presentation of the evidence was necessary to preserve the issue on appeal. (*People v. Navarette* (2003) 30 Cal.4th 458, 491; *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 452–453 (*Christ*).)

In *Christ*, *supra*, 2 Cal.App.5th 440, a plaintiff filed a motion in limine to exclude evidence of her husband's extramarital affair as irrelevant and unduly prejudicial. The trial court tentatively ruled that evidence of the affair was admissible but said that all motions in limine were " 'subject to being revisited at any time during the trial as the evidence is developed.' " (*Id*. at p. 451.) Subsequently, when the defendant raised the subject of the affair during cross-examination, the plaintiff's counsel did not object. (*Ibid*.) Under these circumstances, the Court of Appeal held that the plaintiff had not preserved the issue for appeal: "When a court has not finally ruled on an in limine

motion, as in this case, Evidence Code section 353 requires a timely objection during presentation of the evidence at trial to preserve the issue on appeal. By failing to object during trial to admissibility of the evidence on the grounds advanced in the in limine motion, [the plaintiff] failed to preserve the issue for review on appeal." (*Id*. at pp. 452–453, fn. omitted.)

In the present case, where the exclusion of evidence is at issue, we find that the reasoning from *Christ* is instructive. As in *Christ*, the trial court's ruling on the introduction of family law documents was not final because it was explicit that the parties could attempt to introduce the evidence by establishing a hearsay exception. Notwithstanding that invitation, defendant did not attempt to introduce records from the family law case at any time during Lisa or defendant's testimony. Defendant thus forfeited any objection to the exclusion of family court documents.

Even assuming defendant's argument is not forfeited, his claim also fails on the merits. Defendant argues that the trial court limited his ability to question witnesses about the family law case based upon Evidence Code section 352. However, the trial court did not exclude any evidence or sustain objections to questioning about the family law case based upon Evidence Code section 352. In fact, both defendant and Lisa testified at considerable length regarding the family court proceedings. Defendant specifically testified regarding his inability to see his children due to the restraining order and his belief that Lisa became dissatisfied with the shared custody order beginning in the summer of 2019.

At no point can it be said that the trial court excluded any evidence regarding the family court proceedings based upon relevance grounds. The trial court's ruling on the motion in limine to exclude family law court documents without a party establishing an exception to the hearsay rule is not specifically or adequately addressed by defendant on appeal. Defendant does not articulate which specific document should have been admitted or which hearsay exception was applicable. Thus, we reject defendant's

11.

challenge to the trial court's exclusion of hearsay evidence because he has failed to adequately develop it. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 [" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' … We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.' "].) Accordingly, we reject defendant's claim that the exclusion of any family court documents was in error.

## II.     Consecutive Sentencing

Defendant argues the trial court failed to properly exercise its discretion and appeared unaware that it had discretion to impose nonconsecutive sentences pursuant to section 667.61.

### A.     *Procedural History*

On December 9, 2019, the Kings County District Attorney filed an information charging defendant with three counts of lewd and lascivious acts upon a child under the age of 14. (Pen. Code, § 288 subd. (a).)[1] A jury found defendant guilty on counts 2 and 3 on June 17, 2021. The jury also found defendant guilty of a lesser included offense of count 1, attempt to commit lewd or lascivious acts with a child under the age of 14 years.

The probation officer recommended that defendant be sentenced to probation. A five-year six-month prison sentence with consecutive terms was recommended if the trial court did not believe probation was appropriate. At defendant's sentencing on July 16, 2021, the prosecution disagreed with the recommendation of the probation officer and argued that an appropriate term would be eight years. Defendant requested that he be granted probation, or a mitigated prison sentence as recommended by the probation officer. The trial court sentenced defendant to prison for a determinate term of nine years

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

as follows: a middle term of six years on count 2; one-third the middle term of two years on count 3 to be served consecutively; and one-third the middle term of one year on count 1 to be served consecutively.

In sentencing defendant, the trial court stated as follows:

"The probation officer's recommendation is based upon a test that says he is not likely to reoffend. But the fact of the matter is, as found by the jury, he did reoffend, twice after the initial incident and perpetration on the victim. So this wasn't just the one off single event over a significant period of time, he did reoffend. Which troubles the Court. And indicates to this Court, notwithstanding what that SARATSO test says, that he is likely to again potentially reoffend because that's what he's done in the past.

"All right, the Court firmly believes that probation is not appropriate in this case. Among the factors, including the Court's serious concern that the defendant would reoffend, is the victim's particular vulnerability, being at the age of five, the harm that was done to the victim. It was quite evident at the time of trial, I personally saw how the victim testified, her emotional condition, and it was pretty clear that she is still significantly suffering trauma, psychological trauma from the perpetration of these acts by the defendant.

"The defendant of course was an active participant in the case, took advantage of a position of trust. [¶] I do notice a lack of prior criminal record and his indication that he's willing to comply with the terms and conditions of probation. That is not enough to warrant in this Court's mind a grant of probation.

"Now as to the selection of a term, there are various factors in aggravation, again, the significant injury to the victim in this matter, the victim, again, being particularly vulnerable. Those factors are very weighty in this Court's mind. Just the injury that the victim suffered and will continue to suffer, and it's just life altering, so she's basically done a life sentence because of what the defendant has done.

"And balancing that against the defendant's lack of criminal record, in weighing all of these various factors, the Court is going to sentence as follows: Deny probation. As to Count 2, violation of Penal Code Section 288(a), sentence you to the mid term of six years. As to Count 3, for a consecutive term, by operation of law that's one-third the mid term, so that

would be an additional two years. Plus an additional one year on Count 1. For a total of nine years in the California State Prison. Both Counts 1 and 3, one-third the mid term. Count 3 is a violation of 288(a), the mid term is six years, so one-third of that is two years. The Count 1 is attempted 288(a), mid term is three years, so one-third of that would be one year."

**B.**     *Applicable Law and Standard of Review*

Section 667.61, also known as the "One Strike" law (*People v. Hammer* (2003) 30 Cal.4th 756, 759), mandates consecutive sentences for certain offenses. (See § 667.61, subd. (i) ["For any offense specified in paragraphs (1) to (7), inclusive, of subdivision (c), or in paragraphs (1) to (6), inclusive, of subdivision (n), the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions …."].)

Violations of section 288, subdivision (a), do not constitute qualifying offenses. (See § 667.61, subds. (c)(8), (i).) "However, nothing in [section 667.61,] subdivision (i) purports to proscribe the imposition of consecutive one strike sentences for those whose predicate offense was under section 288, subdivision (a). To the contrary, it merely provides a limitation on the *mandatory* imposition of such terms, which by implication leaves the decision to impose consecutive or concurrent terms to the sentencing court's discretion under section 669." (*People v. Valdez* (2011) 193 Cal.App.4th 1515, 1524.)

"It is well established that a trial court has discretion to determine whether several sentences are to run concurrently or consecutively." (*People v. Bradford* (1976) 17 Cal.3d 8, 20.) Accordingly, we review a trial court's decision whether to impose concurrent or consecutive sentences under an abuse of discretion standard. (*Ibid*.) An abuse of discretion will only be found in limited circumstances, such as where a trial court is unaware of its discretion, considers impermissible factors in the exercise of that discretion, or renders a decision "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 378.)

**C.   *Analysis***

As a threshold matter, the People contend defendant forfeited his claim that the trial court was unaware of its discretion to impose concurrent terms by failing to object at sentencing.  We agree.

In *People v. Scott* (1994) 9 Cal.4th 331, 353 (*Scott*), our high court held that "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" are subject to forfeiture and cannot be raised for the first time on appeal.  This includes "cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons."  (*Ibid*.)

Here, defendant did not request the trial court impose concurrent sentences.  Moreover, defense counsel asked for the mitigated sentence recommended by the probation officer if the trial court was not inclined to grant probation.  The probation officer's recommended prison sentence consisted of consecutive terms, and defendant's counsel made no objection to that recommendation.  Defendant may not now challenge the trial court's imposition of consecutive sentences for the first time on appeal.  (*Scott*, *supra*, 9 Cal.4th at p. 356.)

Defendant contends his claim the trial court was unaware of its discretion is reviewable even though no objection was raised below.  However, defendant's sentence was lawful as the trial court had the discretion to impose consecutive terms.  Thus, defendant's claim does not fall within the exception for an "unauthorized sentence," which is a sentence that "could not lawfully be imposed under any circumstance in the particular case."  (*Scott*, *supra*, 9 Cal.4th at p. 354.)  *Scott* held that forfeiture applies to "sentences which, though otherwise permitted by law, were imposed in a procedurally or factually flawed manner."  (*Ibid*.)  Accordingly, defendant's claim is forfeited.

Even if we concluded defendant had not forfeited this claim, we would not remand the matter for resentencing because "the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)  At sentencing, the trial court rejected the probation officer's recommended sentences of either probation or a prison term of five and a half years.  The prosecution even suggested that an appropriate prison term for defendant would be eight years.  In sentencing defendant to a nine-year prison term, the trial court emphasized defendant's likelihood to reoffend and C.V.'s "life altering" and significant emotional trauma as a "particularly vulnerable" victim.  These comments clearly demonstrate that the trial court would not impose a different sentence.  Therefore, even if we accepted defendant's claim, we would not remand the matter for resentencing, because to do so would be an "idle act."  (*People v. Coelho* (2001) 89 Cal.App.4th 861, 889.)

## DISPOSITION

The judgment is affirmed.


POOCHIGIAN, Acting P. J.

WE CONCUR:


PEÑA, J.


DE SANTOS, J.

16.