Filed 4/20/22  Clifford v. Alpha Epsilon Pi Fraternity CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Sacramento)

----

| | |
|---|---|
| RYAN CLIFFORD, | C087528 |
| Plaintiff and Appellant, | (Super. Ct. No. CV091282) |
| v. | ORDER MODIFYING OPINION, DENYING REHEARING, AND DENYING PUBLICATION |
| ALPHA EPSILON PI FRATERNITY, INC. et al., | |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the nonpublished opinion filed herein on March 21, 2022, be modified as follows:

On page 39, second sentence of the second full paragraph, the word "defense" should be replaced with "Clifford's" so the sentence reads:

> These numbers were suggested in closing argument by Clifford's counsel, who acknowledged that "[p]ain and suffering is probably the most difficult aspect of any case because that's kind of—what's it worth to be disabled."

1

There is no change in the judgment.

Appellant's petition for rehearing and respondent's request to publish the opinion are denied.


BY THE COURT:


_____/s/_____
RAYE, P. J.


_____/s/_____
BLEASE, J.


_____/s/_____
HOCH, J.

Filed 3/21/22  Clifford v. Alpha Epsilon Pi Fraternity CA3 (unmodified opinion)

# NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| RYAN CLIFFORD, | C087528 |
| Plaintiff and Appellant, | (Super. Ct. No. CV091282) |
| v. | |
| ALPHA EPSILON PI FRATERNITY, INC. et al., | |
| Defendants and Respondents. | |

Ryan Clifford sued a national fraternity, Alpha Epsilon Pi Fraternity, Inc. (Alpha), and its local chapter at the University of California, Davis (UC Davis), Chi Delta (Delta), for hazing and negligence based on two incidents that occurred when he was a pledge in 2008.[1]  A jury awarded Clifford $202,716 in total damages, which the trial court reduced

---

[1] This case was the subject of a prior appeal in which we held that the trial court improperly dismissed this case when Clifford refused to pay $2,500 in travel expenses incurred by the fraternities, as ordered by the court in exchange for a continuance granted to Clifford on the eve of trial.  (*Clifford v. Alpha Epsilon Pi Fraternity, Inc.* (Oct. 28, 2015, No. C070846) [nonpub. opn.] (*Clifford*).)

1

in response to posttrial motions to a judgment of $38,735.95 in favor of Clifford against Delta and $33,259.03 in favor of Alpha against Clifford. We will affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Pretrial Proceedings

In May 2009, Clifford filed a complaint against Alpha, Delta and Daniel Sacher (a fraternity member) alleging claims for violation of Penal Code section 245.6[2] and negligence on various theories. Clifford alleged that in October 2008, as a pledge, he was forced to drink "inordinate amounts of alcohol" at a retreat at Lake Tahoe to the point that he blacked out. Clifford further alleged that in November 2008 at the fraternity house he was pressured to drink and play drinking games. At the conclusion of a game, Sacher allegedly tackled Clifford, severely injuring his foot and ankle, which required multiples surgeries and left him with lost range of motion, a permanent limp, severe pain and increased susceptibility to arthritis. Clifford alleged on information and belief that Alpha and Delta had a history of hazing and the UC Davis Police and Alpha were on notice that excessive drinking had occurred at Delta pledge events.

After we remanded the case in 2015, the matter was set for trial in Yolo County Superior Court. At a trial readiness conference in late January 2018, counsel for Clifford informed the court of his intention to subpoena judges of the Yolo County Superior Court, based on a contention that the case had been dismissed as result of a conversation among judges of the court (rather than failure to pay the fraternity's travel expenses, as set forth in our prior opinion). A retired judge ultimately quashed the subpoena. However, the full bench of Yolo County Superior Court signed recusal memoranda and

---

[2] Penal Code section 245.6, which makes "hazing" unlawful, defines hazing as "any method of initiation or preinitiation into a student organization . . . which is likely to cause serious bodily injury to any former, current, or prospective student," and permits a "person against whom the hazing is directed [to] commence a civil action for injury or damages." (Pen. Code, § 245.6, subds. (a), (b) & (e).)

2

the case was transferred to a Sacramento County Superior Court judge, assigned to sit as a judge of the Yolo County Superior Court.

**B.    The Trial**[3]

###    1.    Plaintiff's case

####        a.    Ryan Clifford

Clifford was the first witness for the plaintiff.

Clifford transferred to UC Davis in the fall of 2007. As part of orientation, a Delta fraternity member led a tour around campus.[4]

Clifford sought admission to Delta in October 2008. He testified that he was dating a Jewish woman and chose Delta for its religious aspect because he intended to convert to Judaism. There were 25 individuals in his pledge class and he was the only one who was not Jewish.

The pledge process included pressure to drink alcohol. A pledge could be dropped from the fraternity if he did not follow the dictates of the pledge masters.

There were pledge events every Tuesday night. The first event was a scavenger hunt. The second event involved fraternity members pressuring pledges to drink, blindfolding them, and driving out to the Yolo causeway late at night to place large rocks spelling out the fraternity letters, a tradition for fraternities and sororities at UC Davis.

Pledges were informed by the pledge master that there would be a retreat at Lake Tahoe starting on October 17, 2008. Pledges were blindfolded on the drive until they stopped for food. When they arrived, 23 pledges were told they would be sleeping in one small bedroom. They were told not talk to anyone about what went on at the event.

---

[3] Sacher settled on the first day of trial.

[4] In his testimony, Clifford referred to Alpha. To avoid confusion, we refer to Delta regarding events involving the local chapter and Alpha for events involving the national organization.

Clifford testified that fraternity members guided him through a ritual where he was told to drink something that tasted very salty. A fraternity member said that the pledges were divided into families named after alcoholic drinks and Clifford was in the vodka family. The member told Clifford to drink alcohol mixed with cranberry juice. Clifford drank it over a period of time. Sacher introduced himself as the father of the vodka family and told the history of the family. Sacher was one of the lieutenant pledge masters. Clifford blacked out.

Clifford woke to find fraternity members "flicking" his penis and laughing. Clifford identified a photograph of fraternity members standing over him on a bed, which he said was taken while the flicking was occurring. Clifford testified that fraternity alumni explained to him that fraternity members called this "rat fucking," a prank where members kidnapped a pledge and forced them to drink alcohol or soy sauce and could beat them up as long as they didn't kill them.

Clifford woke up the next morning in his sleeping bag with his clothes folded in a pile next to him and his boxers around his ankles.

That night, the president of the fraternity, the pledge master and lieutenant pledge masters wanted to know who had spoken to their parents about what was going on. Clifford had called his mother earlier that day. Clifford did not inform the fraternity members.

The pledges were told the national fraternity would be coming and they needed to prepare by drinking alcohol while blindfolded. When the blindfolds were taken off, there were two strippers and a "pimp." Clifford left the next morning. He had no money and no way of getting home on his own.

Despite this incident, Clifford wanted to stay in the fraternity, the only Jewish fraternity on campus, because he wanted friends and was going to convert to Judaism and be circumcised. A therapist he was seeing, Betsy Ramsey, warned him to stop pledging because the fraternity sounded bad.

4

On November 5, 2008, Clifford was at a weekly pledge event at the fraternity house to practice a musical routine to serenade the sororities. Clifford had received notice that this was to be a family night, scheduled by Sacher, the father of Clifford's alcohol family. Sacher took Clifford and his pledge brothers to an alumnus fraternity member's house where members were drinking and watching UFC fighting. Sacher, Clifford, and another member and pledge went back to the fraternity house. Sacher and another pledge played a game of beer pong against Clifford and another member. Beer pong involved throwing ping pong balls into the other side's cups, which they have to drink. Clifford's side won. The game involved "trash talking." After the game, Clifford told Sacher's side that "you guys suck." Sacher and his teammate started to come around the table and Clifford's teammate advised Clifford to leave. Clifford tried to run out of the room over a couch. Sacher fell over trying to grab Clifford, who told Sacher he was drunk. Clifford tried to get over the couch but Sacher put Clifford in a chokehold and stomped on his foot. Clifford screamed and told Sacher to get off. Sacher realized something bad had happened and went to get a bag of ice.

When Clifford's shoe and sock were off, his foot was black and blue. He hopped out to his car and drove with his left foot to his parent's house, who took him to the emergency room. X-rays showed that his right foot was fractured.

The next day Clifford saw Dr. Hunter Greene, who suggested surgery. Approximately a week later, Clifford had his first surgery. Dr. Greene put two screws in Clifford's foot to fix the bones together. Clifford was in a cast for some weeks, and, after the cast was off, had six weeks of physical therapy. Dr. Greene told Clifford he could resume normal activities, but he was unable to walk normally without pain. In January 2010, Dr. Greene performed another surgery to take the screws out. The surgery did not alleviate his pain, and Dr. Greene suggested fusion, a surgery he could not do. In November 2011, Clifford had third surgery performed by Dr. Chris Coetzee in

5

Minnesota. There was improvement in the pain underneath his foot but other pain had increased. In 2012, Clifford started using a cane.

Clifford testified he cannot run, walk, or exercise, and drives with his left foot, with no improvement in sight. He received pain medication after each surgery and continued to be on pain medication.

Since 2008, Clifford's main therapist was Dr. Linda Barnard. He was prescribed Effexor for emotional and psychological issues resulting from the Lake Tahoe incident. The medication made him depressed and suicidal. Clifford testified that he engaged in destructive behavior, including going to San Francisco and filming pornographic videos "to have myself used."

Clifford was not aware of any supervision by Alpha or Delta during the October and November 2008 incidents or any attempt to regulate behavior at the fraternity house. His understanding was that Alpha controlled Delta. After the Lake Tahoe retreat, Clifford begged his mother to call Alpha and she did.

Clifford did not consent to a wrestling match with Sacher, who is six feet two inches tall and 210 pounds while Clifford is five feet 10 inches tall and 135 pounds. Notes from Dr. Greene and Dr. Blohm, who treated Clifford at the hospital, indicated his injury resulted from rough housing or wrestling, but Clifford never told them that. Clifford told Dr. Blohm that Clifford's lieutenant pledge master tackled him from behind.

Clifford did not graduate from UC Davis in 2009 as originally planned, but skipped the spring quarter and graduated in June 2010. He was not able to enter the workforce after graduation because of physical and emotional pain. Since October 2014, Clifford has worked for the state public health department. Clifford testified he can only provide limited help to his parents around the house, sleeps only four to five hours a night, drives only with his left foot, uses the elevator at work, and has a handicap placard for his car. He takes pain medications, which affect his ability to concentrate.

Clifford's parents fronted the costs of his medical expenses. Clifford has been paying back his parents $1,000 to $2,000 a month.

### b.     Paul Cody

Paul Cody was the UC Davis liaison to fraternities and sororities from 1997 to 2009.

UC Davis Police referred a complaint to student judicial affairs, which was then referred to Cody, about pledges being forced to drink alcohol at the Lake Tahoe retreat. Cody e-mailed Delta to set up a meeting to discuss the allegations. After the meeting, on November 3, 2008, Cody sent a letter to Delta placing the fraternity on conditional registration. By June 2009, Delta had not met all the conditions requested in the November 2008 letter.

On cross-examination, Cody testified that he was not aware of any claim that there was a sexual assault at the Lake Tahoe retreat until June 2009.

### c.     George Jouganatos

George Jouganatos testified as an economics expert.

Jouganatos opined, based on the Bureau of Labor Statistics database and an interview with Clifford, that Clifford's ability to perform household services was diminished by 50 percent. Household services include cleaning, shopping, personal hygiene and yard work. Jouganatos determined that Clifford lost $7,000 per year in household services for a total of $54,358.

Jouganatos further determined that Clifford lost compensation of $45,000 a year, including benefits, which, adjusted for wage growth, from 2009 to 2014, totaled $180,000 in past lost wages and benefits.

Jouganatos was not able to opine on future wage loss but determined that future lost household services for Clifford's approximately 45-year life expectancy totaled $300,545.

His opinion on the total amount of all Clifford's economic losses was $534,358.

On cross-examination, Jouganatos admitted that Clifford gave him the 50 percent number for diminished ability to perform household services and Jouganatos applied that to the database. Jouganatos also admitted that his opinion that Clifford could not work for four years because of his injury was based on information Clifford provided.

### d.    Linda Clifford

Linda Clifford is Clifford's mother.

On October 18, 2008, Ms. Clifford got a telephone call from Clifford, who was in Northern California, possibly Lake Tahoe. He said he had woken up with his clothes gone, except for his shorts, which were below his knees. Ms. Clifford suggested that his father pick him up but Clifford said he wanted to stay there, hoping things would change. When he came home the next day, Clifford said he was hurting all over.

Ms. Clifford decided to call Alpha, the national organization of the fraternity. Ms. Clifford spoke to Libby Anderson. Ms. Clifford said, as a parent, she was concerned about an off-site event where Clifford had told her there were strippers, marijuana and alcohol. Ms. Clifford was hoping Alpha would investigate. Anderson said she would pass it on and have somebody look into it. Ms. Clifford did not give her name.

On November 5, 2008, when Clifford got home, he was in great pain. His foot was "stomped on." His parents took him to the emergency room. Clifford said they were having family night at the fraternity house, and, when they were finishing up, a fraternity member told Clifford he better get out of there. Clifford could see someone charging him and he tried to get out of the door but chairs were piled in front of it. Before Clifford could make it out, a fraternity member came up behind, put his hands on Clifford's neck, and stomped hard on his foot. Clifford felt something pop and he was in terrific pain. Clifford laid on the floor in pain, eventually hobbled out, and drove home with left foot.

Ms. Clifford did not recall Clifford saying anything to a doctor indicating he had been in a wrestling match or rough housing at the fraternity house.

Clifford had two surgeries with Dr. Greene and a third surgery with Dr. Coetzee. Clifford went to physical therapy and has continued to go when needed. Clifford started using a cane periodically, but since 2014 he has used it constantly.

Ms. Clifford testified that, since the incident in November 2008, Clifford has changed drastically; he feels rejected in life, needs to be reassured, and is unhappy a lot of the time. Clifford is in constant pain. He used to help his father cutting the lawn and with his father's construction business working on the computer, but he could no longer do that. He used to exercise with his former girlfriend but now even swimming was difficult.

### 2. Defendants' case

#### a. Elizabeth Ramsey

Elizabeth Ramsey, a marriage and family therapist, first saw Clifford in September 2008. In an October 2008 visit, Clifford reported that he went on a fraternity retreat, drank a bottle of vodka, vomited on himself, and passed out. Ramsey talked to Clifford about consumption of alcohol at a fraternity and he said he would not drink like that anymore. Ramsey did not recall Clifford saying he had been sexually assaulted or fondled at the October 2008 retreat.

In a November 2008 visit, Clifford told her about a foot injury that occurred when he was at a fraternity party and a fraternity member who was really drunk stomped on Clifford's foot.

On cross-examination, Ramsey testified that a person who had been sexually assaulted would have trouble relating the events, dealing with the assault, and trusting people. Clifford talked about going to student judicial affairs in June 2009 to report hazing. Clifford talked about being coerced into drinking at the fraternity. The events at the fraternity caused Clifford increased anxiety and depression. In June 2009, when Ramsey last saw Clifford, he was limping and using a cane. He was concerned about permanent damage to his foot and being crippled.

9

### b.     Adam Sumner

Adam Sumner was a lieutenant pledge master at Delta when Clifford was a pledge.  Clifford was pledge president, elected by the other pledges.  At the time, there were fraternity members who were not Jewish.

Sumner did not participate in any bullying directed towards Clifford or observe fraternity members engaged in bullying.  When Clifford was pledging, alcohol was involved in pledging activities, but the fraternity did not force pledges to drink alcohol, and Sumner observed pledges declining to drink with no adverse impact.

Sumner was involved in the Lake Tahoe retreat.  Sumner was never told during the retreat that Clifford had been sexually assaulted.  Sumner first heard about it in mid-2010.

Sumner was present when Clifford's foot was injured at the fraternity house.  Sumner recalled Sacher and Clifford wrestling.  Sacher asked who wanted to wrestle, Clifford entered a sort of ring that had formed, and the two touched hands to acknowledge they were about to begin.  Sacher was attempting a wrestling move, which he did not execute properly, and stepped on Clifford's foot.  Sacher had been playing beer pong and drinking.  Clifford ended up on the floor, could not walk, and was in great pain.  Sumner and the fraternity president said that the fraternity had insurance for his injuries and offered to drive Clifford to the hospital, but he declined and said it was not a big deal.  Someone got Clifford some ice.  Sumner next saw Clifford a few weeks later when he was initiated as a member of the fraternity.

Sumner testified that "rat fucking" is when pledges haze a member and involves pledges kidnapping a member and making him drink.

On cross-examination, Sumner testified that an e-mail from the fraternity's pledge master encouraging members to gain the trust of pledges "to haze the shit out of them" was a joke.

10

### c. Daniel Sacher

Daniel Sacher was a lieutenant pledge master in fall 2008. He went on the Lake Tahoe retreat. He saw Clifford drink vodka the first night at the Lake Tahoe retreat. Sacher did not see where Clifford slept that night. Sacher saw Clifford the next day when the attendees played football. Clifford was hung over and not feeling great.

Sacher later learned from the Delta president that there had been a report of drinking at Lake Tahoe. They had to revise the pledge program because Delta was placed on probation. The revision was that alcohol could not be used at pledge events.

The night Clifford's foot was injured Sacher first saw Clifford at an impromptu activity at the house of a fraternity alumnus. Afterwards, the group went to the fraternity house to play some games. Sacher played a game of beer pong with Clifford. There were four of them in two teams, a pledge and a member on each team. After the game ended, the four of them moved to another room and started wrestling. There was "trash talk" between the players during the game, including Clifford. The game was tied and part of the trash talking was that if Clifford's side won, they would go into the next room and wrestle. Clifford's side made their last cup and they went into a larger adjacent room to wrestle. Sacher was paired with Clifford; both pairs wrestled at the same time. They squared off and slapped hands to show they were ready to start the match. Clifford slapped hands with Sacher. They tied up in clinch. Sacher got his left hand under Clifford's right armpit and right arm around the back of his head to do a hip throw. He didn't realize he was standing on Clifford's foot. When they went to the ground, Clifford's foot was pinned under Sacher's foot. That's how Clifford's injury occurred. When Clifford said he was hurt, Sacher immediately got off him and Sumner brought some ice.

Sacher did not stomp on Clifford's foot. He did not grab Clifford by the neck. Sacher was facing Clifford, not behind him. Sacher did not run across the room to take

11

Clifford out. Sacher thought that Clifford had a sprain or twisted ankle. He did not realize the severity of the injury.

After Clifford's foot was injured, on one occasion he came to Sacher's apartment to talk about the accident and they reconciled. Clifford was concerned about continuing in the pledge program. The fraternity members reassured Clifford that the fraternity would make accommodations.

Clifford was initiated as member of the fraternity. This was a formal event. He was dressed in a jacket and tie and on crutches. Sacher and Clifford continued to see each other and Sacher would ask how he was feeling and what was the latest information on his surgeries and medical care. Clifford only came to a few more fraternity events and stopped in winter of 2009.

On cross-examination, Sacher testified that he was elected treasurer of Delta in 2007 and served for two years. His responsibilities included collecting dues, which were paid to the national fraternity and Delta. A "good chunk" of a member's dues, particularly a pledge's dues, went to the national fraternity for initiation and insurance. The balance went to the local chapter for its events.

Sacher admitted that pledge events involved alcohol, in violation of the national fraternity's rules. He admitted that alcohol was provided to members and pledges under the age of 21.

Sacher also admitted that the pledge master sent an e-mail about members getting close to pledges to haze them. Sacher admitted that, after Clifford was injured, the members joked that if a member did not pay his dues Sacher would break his foot.

Sacher testified that "rat fucking" is where pledges playfully kidnap a member, quiz the member on fraternity lore, and give him beer to drink.

### d. Elizabeth Anderson

Elizabeth Anderson was director of operations at Alpha from 2007 to 2010.

12

Alpha has 120 chapters across the United States. Chapters are self-governed, but subject to expectations and protocols to stay in recognition by Alpha.

In November 2008, Anderson received an anonymous call from a mother about concerns with the UC Davis chapter. The caller talked about a retreat in Lake Tahoe where there were strippers and drinking every day. Anderson was concerned because the pledging program is not to have alcohol involved. The caller described an activity where pledges spelled out the fraternity letters with rocks.

Anderson said that Alpha would investigate the situation and follow up with UC Davis. Alpha followed up with UC Davis, which had also received similar allegations, deferred to UC Davis to investigate the matter, and stayed in touch with Cody. Anderson called the Delta president, who did not deny that these activities took place. Cody wrote a letter copied to Alpha imposing conditions on Delta. Delta had to complete a workshop on hazing and pledge education with 75 percent of the members attending. This condition was satisfied by members' attendance at the Alpha western regional conclave where Anderson and legal counsel presented a risk management program. An Alpha staff person worked with Delta leadership to address other sanctions imposed by UC Davis.

On cross-examination, Anderson stated that Alpha requires local chapters to notify the national organization of any injury. Anderson admitted that Alpha had no record of an injury at Delta in November 2008.

### e. Seema Khan

Seema Khan, a psychiatrist, saw Clifford from July 2009 to September 2010. Clifford never told Khan that he had been sexually assaulted.

On cross-examination, Khan testified that Clifford was prescribed Effexor, an antidepressant, which, if the patient had a family history of bipolar disorder, could precipitate manic symptoms including inability to concentrate, distractibility, increased and rapid talking, increased sexual desire, and inability to finish projects.

### f.     Hunter Greene

In November 2008, Dr. Greene, an orthopedic surgeon, saw Clifford for an injury to his foot.

According to medical records, in an interview with Dr. Greene, Clifford said that he was at a fraternity party and was rough housing, a friend stepped on his foot and pushed him backwards, at which point he had an immediate onset of sharp pain in his right foot.  The words "rough housing" were in quotation marks in the medical records to indicate that Clifford spoke these words.  Dr. Greene diagnosed the injury as a "Lisfranc fracture," which he treated by reducing the fracture and stabilizing it with screws.  Dr. Greene performed another surgery to remove the screws.

In June 2010, Clifford called Dr. Greene's office asking Dr. Greene to change the wording from the initial visit about how Clifford was injured.  Dr. Greene responded that the record reflected the information given at the time.  Dr. Greene did not change the medical record.

On cross-examination, Dr. Greene testified that Clifford continued to complain about pain after both surgeries and Dr. Greene gave Clifford hydrocodone.[5]

---

[5] Excerpts of the depositions of Andrew Borans, Louis Sachs, Gary Clifford and Tyler Gregory were reenacted for the jury but were not reported in the trial transcript.  A video recording of the deposition of Dr. Michael Klein was played to the jury and not reported in the trial transcript.  On appeal, Clifford has included in his appendix the entire deposition transcripts of Borans, Gregory and Sachs.  Respondents' appendix includes the full transcripts of the depositions of Gary Clifford and Dr. Klein.  The complete transcripts of the Borans, Sachs, Gary Clifford and Gregory depositions were marked as exhibits for identification at trial, but the transcripts included in the appendices do not have the superior court's stamp or exhibit label.  A video flash drive of Dr. Klein's deposition was admitted in evidence, as well as a transcript of the deposition, also without the superior court's stamp or exhibit label.  The trial court's discussion with the parties' counsel indicates that only excerpts of the Borans, Sachs, Gary Clifford and Gregory transcripts were reenacted.  The record does not indicate which portions of the transcripts were reenacted.  The record also does not disclose whether a video of all or a portion of the Dr. Klein deposition was played to the jury.  Thus, the full deposition

### g.    Ethan Sorscher

Ethan Sorscher was in Clifford's pledge class.  The class picked Clifford as pledge class president.  Sorscher attended the Lake Tahoe retreat.  Sorscher is in the photo taken on the retreat that Clifford testified shows members of the fraternity flicking his penis. Sorscher was never present in a situation where somebody was touching the penis of someone on the bed.  Sorscher never saw fraternity members at the Lake Tahoe retreat assault or abuse a pledge or touch the penis of a pledge.

On cross-examination, Sorscher testified that members gave alcohol to pledges under the age of 21.  Sorscher testified that "rat fucking" is where pledges collect members from other families in the fraternity and force them to drink.

### h.    Mark Strassberg

Dr. Mark Strassberg, a psychiatrist and neurologist, performed a psychiatric evaluation of Clifford.  Dr. Strassberg reviewed Clifford's medical records, his deposition, and Ramsey's deposition, and interviewed Clifford in June 2010.  Clifford stated he had no emotional problems before joining the fraternity, but, since at least age 13 or 14, Clifford had been in treatment and prescribed multiple different antidepressants and antianxiety drugs.  Clifford stated that he was doing fine with his family, but Ramsey noted his difficulty living with his family and conflicts with his parents.  Clifford stated in the interview that three quarters of Ramsey's notes were incorrect.  Clifford said he had few friends, was socially isolated, and joined the fraternity to have a group of people that would become his friends.

---

transcripts—running to hundreds of pages—are not records of the evidence presented to the jury.  Accordingly, the court will disregard citations to these deposition transcripts and deposition exhibits.  (See *Sahadi v. Scheaffer* (2007) 155 Cal.App.4th 704, 722-723 [deposition excerpts not filed or lodged with the trial court were not proper matters for inclusion in the appendix].)

15

Dr. Strassberg diagnosed Clifford with anxiety disorder, depressive disorder and personality disorder, which were clinical disorders that existed before he joined the fraternity. Clifford had been in and out of treatment since he was 13 or 14 years old.

On cross-examination, Dr. Strassberg testified that Clifford told him about waking up with his underwear around his ankles but nothing about people flicking his penis.

### i. Brian Goldberg

Brian Goldberg was Clifford's big brother in the fraternity. He attended the Lake Tahoe retreat. He poured Clifford a shot of vodka. He did not place any drug or other substance in the glass with vodka.

Goldberg was at the fraternity house in November 2008 when Clifford was injured. Goldberg was in a dining room talking to someone and he saw in the next room that Sacher and Clifford had their hands on each other's shoulders. Sacher put his leg behind Clifford's leg in a move where you lower someone to the ground. Clifford said that he did not want to wrestle. Sacher lowered Clifford to the ground. Clifford suddenly said his foot hurt. Clifford limped out the front door saying that he was fine. Goldberg never saw Sacher with his arm around Clifford's neck.

On cross-examination, Goldberg testified that "rat effing" is where pledges get back at members who have been nasty to them, tie them up, and make them drink and answer questions.

### j. Gregg Stutchman

Gregg Stutchman testified that he is a forensic analyst whose work involves scientific examination, evaluation, comparison and clarification of audio and video recordings. Stutchman downloaded a video from Web site named Beyond Kink. The video contained nudity and graphic sexual activity. The video also contained interviews with Clifford.

The explicit scenes and interviews with another person were edited out. An edited video of the interviews with Clifford was played to the jury. Prior to playing the video,

16

the trial judge instructed the jury, "Ladies and gentlemen, you are about to view a video which has been admitted as evidence for a limited purpose. You may consider this video only for the purposes of evaluating Mr. Clifford's credibility and for ascertaining the nature and the extent of the damages that he is claiming in this trial. You may not consider the video for any other purpose."

In a transcript of the interview, Clifford discussed searching for "TSs" on Craig's List, which Stutchman interpreted to mean "transsexual." Clifford said, "This is a fun fetish on the side a lot of people like to enjoy." Regarding making the film, Clifford said, "it was a lot of fun" and "pretty amazing," Asked "What happened to you today?" Clifford answered, "Hmmmm. A dream come true."

### k. Maura Chavez

Maura Chavez testified that she is surveillance investigator. Chavez was assigned to video Clifford's activities. The video was played to the jury. On January 27, 2018, Chavez filmed Clifford going into and coming out of a hotel. Going into the hotel, Clifford did not have a cane. Coming out of the hotel, Clifford had a cane but was not limping.[6]

## C. Verdict and Judgment

On March 14, 2018, the jury rendered a verdict on special verdict forms finding that: (1) Alpha was not liable on any of Clifford's claims; (2) Delta was not liable for hazing; (3) Delta and Sacher were liable for negligence regarding the events of November 5, 2008; and (4) Delta was liable for premises liability regarding the events of November 5, 2008. As to negligence, the jury allocated responsibility for the harm to Clifford as follows: 40 percent to Delta, 30 percent to Clifford, and 30 percent to Sacher.

---

[6] Video surveillance recordings made by Chavez and another surveillance investigator, Kyle Turner, were played to the jury. The video recordings were admitted in evidence but not included in the record on appeal.

As to premises liability, the jury allocated responsibility for Clifford's foot injury 50 percent to Delta and 50 percent to Clifford. The jury made specific findings rejecting Clifford's claims that, on October 17, 2008, he was pressured to engage in excessive drinking or the victim of sexual battery.

The jury determined Clifford's damages as follows: (1) $49,216 for past medical expenses (per the parties' stipulation); (2) $3,500 in lost household services for the events of November 5, 2008; (3) $100,000 for pain and suffering for the events of November 5, 2008; and (4) $50,000 for future pain and suffering. The jury awarded $202,716 in total compensatory damages. The jury awarded no punitive damages.

The trial court entered judgment in favor of Alpha and against Delta in the amount of $141,901.20.

## D. Posttrial Motions and Judgment

Delta filed a motion to vacate the judgment on the grounds that the judgment did not correctly calculate Delta's proportionate share of damages, did not reflect an offset for Sacher's settlement, and failed to reduce past medical expenses under *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541.

Clifford filed a motion for a new trial and judgment notwithstanding the verdict, contesting the verdicts on liability and damages as contrary to the evidence and arguing that the court's failure to admit certain evidence was an abuse of discretion.

Delta and Alpha moved for an award of costs under Code of Civil Procedure section 998 and a deduction of costs from the damages award.

The trial court denied the motion for a new trial or judgment notwithstanding the verdict and granted in part and denied in part the motion to vacate the judgment. The court ordered the judgment corrected: (1) to reflect Delta's 40 percent proportionate share of noneconomic damages, $60,000; (2) rejecting reduction of past medical expenses under *Howell* based on the parties' stipulation; and (3) to offset Delta's share of

18

economic damages under Code of Civil Procedure section 877 for the settlement with Sacher by $49,407.60, reducing the award against Delta to $3,308.40.

The trial court awarded costs to Alpha and Delta under Code of Civil Procedure section 998, determining that Clifford failed to recover a verdict greater than defendants' settlement offers. The cost award to Alpha was $33,259.03 and $24,572.45 to Delta. The court deducted the cost award to Delta from the adjusted damages award to Clifford. The court entered judgment in favor of Alpha in the amount of $33,259.03 and against Delta in the amount of $38,735.95.

## DISCUSSION

### I

### *Clifford's Opening Brief*

In our prior decision, we noted defects in Clifford's opening brief and cautioned him that a point unsupported by reasoned argument and citations to authority would be treated as waived. Further, we noted that "on appeal, a judgment is presumed correct. We presume the trial court followed the applicable law; the burden is on the appellant to demonstrate otherwise. [Citation.]" (*Clifford, supra*, C070846 [at p. 10].) At the time, Clifford was representing himself and we advised him that this circumstance did not entitle him to lenient treatment. (*Ibid.*) In the present appeal, Clifford is represented by two attorneys. Nonetheless, the defects in his briefing are numerous.

Clifford has failed to provide a statement of facts in his opening brief in conformance with California Rules of Court, rule 8.204(a)(2)(C), which requires "a summary of the significant facts limited to matters in the record." (See *Silva v. See's Candy Shops, Inc.* (2016) 7 Cal.App.5th 235, 260.) He has made no effort to fairly summarize the evidence presented. (*Ibid*.) Clifford's version of the facts is entirely one-sided. He simply ignores evidence that does not support his position, citing only selected "undisputed" testimony and documents favorable to him. (*In re Marriage of Davenport*

19

(2011) 194 Cal.App.4th 1507, 1530-1531 (*Davenport*) [appellant "proceeds to recite the evidence in a fashion favorable to her," which "conduct is not to be condoned"].)

Clifford argues the facts, for example, asserting that he was forced to drink and sexually assaulted on October 17, 2008, and assaulted by Sacher on November 5, 2008, without any mention of contrary testimony by other witnesses to these events. An appellant's attempt to "merely reargue the 'facts' as [he or] she would have them . . . . [Citations.] . . . manifests a treatment of the record that disregards the most fundamental rules of appellate review. [Citation.]" (*Davenport, supra*, 194 Cal.App.4th at p. 1531.) "[S]uch 'factual presentation is but an attempt to reargue on appeal those factual issues decided adversely to [appellant] at the trial level, contrary to established precepts of appellate review. As such it is doomed to fail.' [Citation.]" (*Ibid.*)

We reiterate that "[a]n appealed judgment is presumed correct, and the appellant must affirmatively demonstrate error. [Citation.] An appellant challenging the sufficiency of the evidence to support the judgment must cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law. [Citations.] An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient. The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that there was no substantial evidence to support the judgment. An appellant . . . who cites and discusses only evidence in [his or her] favor fails to demonstrate any error and waives the contention that the evidence is insufficient to support the judgment. [Citations.]" (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408 (*Rayii*); *Sanchez v. Martinez* (2020) 54 Cal.App.5th 535, 548 (*Sanchez*).)

With these principles in mind we turn to Clifford's contentions on appeal.

20

## II

### *Recusal Voided All Decisions of the Yolo County Superior Court*

Clifford argues the full bench recusal of the Yolo County Superior Court voided all orders of the court.  Clifford contends "each Yolo County Trial Judge's decision affecting the trial in Sacramento County Court or any judgment, in particular affecting the presentation of evidence at trial or payment of sanctions or fees to continue the trial was void," and a new trial was required because he was prejudiced by recognition of such orders.

However, Clifford did not object or move to disqualify the assigned judge who presided over all aspects of the trial.  Thus, Clifford has waived this issue.  (*Stebbins v. White* (1987) 190 Cal.App.3d 769, 783 ["failing a simple, timely objection a litigant waives . . . disqualification," and "cannot expressly or impliedly consent to a proceeding before a particular judge and still preserve an objection for appeal"].)

## III

### *Verdict on Hazing*

Clifford contends that the jury ignored jury instructions and uncontested evidence that Alpha and Delta were liable for hazing.  We understand this contention to be that the jury verdict on hazing was not supported by substantial evidence.

To reverse a jury verdict on appeal as unsupported by substantial evidence, Clifford "must show that the evidence was such as would justify a directed verdict in their favor.  [Citation.]  When applying the substantial evidence test, 'we resolve "all conflicts in the evidence and all legitimate and reasonable inferences that may arise therefrom in favor of the jury's findings and the verdict." ' [Citation.]  We do not reweigh the evidence or judge the credibility of witnesses.  [Citation.]  The 'power of the appellate court is limited to a determination of whether there is any substantial evidence, contradicted or uncontradicted, that will support the verdict.' [Citation.]" (*Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 251.)

21

" 'All of *the evidence most favorable to the respondent must be accepted as true,* and that unfavorable discarded as not having sufficient verity, to be accepted by the trier of fact.' " (*Buehler v. Sbardellati* (1995) 34 Cal.App.4th 1527, 1542.) When the record contains substantial evidence in favor of the respondent, "no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)

Clifford has waived this claim by failing to discuss any evidence but the evidence favorable to him. (*Rayii, supra*, 218 Cal.App.4th at p. 1408; *Sanchez, supra*, 54 Cal.App.5th at p. 548.)

Specifically, Clifford has failed to mention testimony of multiple witnesses that Clifford was not sexually assaulted at the Lake Tahoe retreat, including Sorscher who was in the photograph that Clifford said showed fraternity members "flicking" his penis. Most of the evidence Clifford cites in support of this contention is his own testimony. Further, Clifford cites the letter from Cody placing Delta on conditional registration as proof of hazing, while ignoring Cody's testimony that, at the time, there were no hazing allegations against Delta. Cody also testified that he was not aware of any sexual assault claim in November 2008. Clifford claims he was hazed by "forced/coerced drinking of alcohol," while failing to acknowledge that the letter from Cody is to the contrary, expressing concern about that "the fraternity may not have been encouraging or requiring pledges to drink alcohol" but "[p]eer pressure and influence may compel them to drink even though they are not forced to consume alcohol." Clifford claims he was hazed by the tradition of spelling out the fraternity's name in rocks by the Yolo causeway, but his own testimony when asked if this was dangerous was, "I don't think there was a problem with that." Finally, Clifford contends he was hazed by "use/abuse of alcohol" at the fraternity house on November 5, 2008, while failing to mention the evidence that he told Dr. Green the injury was due to "rough housing."

22

IV

*Verdict for Alpha on Negligence and Premises Liability*

Clifford contends that the jury's verdict that Alpha was not liable for negligence and premises liability is not supported by substantial evidence. We disagree.

In asserting that the jury's verdicts were not supported by substantial evidence, Clifford again makes the elementary error of discussing only evidence favorable to him, thereby forfeiting the claim. (*Rayii, supra*, 218 Cal.App.4th at p. 1408; *Sanchez, supra*, 54 Cal.App.5th at p. 548.)

In any event, the jury's finding that Alpha was not negligent is supported by substantial evidence, not the least because, based on the evidence presented at trial, Alpha owed no duty of care to Clifford for the events of October 17 and November 5, 2008.

Clifford relies solely on *Morrison v. Kappa Alpha PSI Fraternity* (La.Ct.App. 1999) 738 So.2d 1105 (*Morrison*) and another out-of-state case, *Brown v. Delta Tau Delta* (Me. 2015) 118 A.3d 789 (*Brown*). In *Morrison*, the court said that a principal is liable for the acts of an agent only when the principal has a right "to control physical details . . . as to the manner of . . . performance" of the agent. (*Morrison*, at p. 1120.) The court conclude that the national organization was not vicariously liable for the tortious conduct of the local chapter's president, because "[t]here is no evidence that the national fraternity exercised any control over the physical details of [the president's] acts of hazing, assaulting and battering [Morrison] during a secret, unscheduled, unsanctioned meeting in [the president's] dorm room." (*Ibid.*)

Citing Alpha's constitution, organizational chart, risk manager manual, the November 3, 2008 letter from Cody, and the presence of Sacher and Delta's president at the fraternity house on November 5, 2008, Clifford contends "all the factors of control exist as shown herein."

However, in *Barenborg v. Sigma Alpha Epsilon Fraternity* (2019) 33 Cal.App.5th 70 (*Barenborg*), the California appellate court held that a national fraternity had no duty

23

of care to a 19-year-old woman who consumed five to seven drinks and cocaine at a party held by a local chapter of the fraternity and sustained serious injuries in a fall. (*Id.* at pp. 75, 76-84.) The court also found that the national organization was not vicariously liable for the local chapter's conduct. (*Id.* at pp. 85-86.)

In considering whether the national organization had a special relationship with the local chapter that would impose a duty of care, the court noted that "two themes" emerged from its review of out-of-state cases: (1) "the existence of general policies governing the operation of local chapters and the authority to discipline them for violations does not justify imposition of a duty on national fraternities"; and (2) "courts have recognized that national fraternities cannot monitor the day-to-day activities of local chapters contemporaneously, and have concluded that absent an ability to do so, there can be no duty to control." (*Barenborg, supra*, 33 Cal.App.5th at pp. 79-80.)

Here, Anderson testified that "[a]ll the chapters are franchises of the national organization" in that they "are self-governed with . . . expectations and protocols to stay in recognition with the national organization." Alpha plays no role in the chapters' day-to-day operations. Local chapters select their own officers and the national organization has no role in the process. The national organization has no employees who reside at the local chapters. Thus, Alpha did not have the ability to monitor the day-to-day activities of Delta and therefore owed no duty of care. (*Barenborg, supra*, 33 Cal.App.5th at p. 80.)

Turning to premises liability, Clifford cites the jury's "Yes" answer to the interrogatory in the premises liability special verdict form: "Did Alpha Epsilon Pi occupy and control the chapter house in Davis?" Having answered affirmatively to this interrogatory, the jury answered "No" to the following interrogatory: "Was Alpha Epsilon Pi negligent in the use or maintenance of the chapter house in Davis?"

Premises liability is "a form of negligence . . . ." (*Brooks v. Eugene Burger Management Corp.* (1989) 215 Cal.App.3d 1611, 1619; see also *Kesner v. Superior*

24

*Court* (2016) 1 Cal.5th. 1132, 1158.) To prevail on a claim for premises liability, the plaintiff must prove that the defendant owned, leased, occupied, or controlled the property, the defendant was negligent in the use or maintenance of the property, the plaintiff was harmed, and the defendant's negligence was a substantial factor in causing the plaintiff's harm. (CACI No. 1000.)

Notwithstanding the jury's affirmative answer to the special verdict interrogatory regarding whether Alpha controlled and occupied the Delta chapter house, the existence and scope of the duty is a question of law for the court to decide. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 237.) Further, in determining whether Alpha was negligent, the jury was instructed to consider "the extent" of Alpha's "control over the condition that created the risk of harm."

We conclude that the scope of Alpha's duty of control did not extend to preventing an accidental injury from an impromptu wrestling match. Alpha did not own the chapter house. (See *Barenborg, supra*, 33 Cal.App.5th at pp. 74, 83.) A housing corporation leased the house, which was owned by another fraternity. The housing corporation subleased the property to Delta. A fraternity member who lived in the house was assigned the position of house leader to manage the house and house rules. No Alpha employees were employed at the local chapters. Thus, Alpha's control did not extend to control of the day-to-day activities of fraternity members and pledges at the chapter house. And the jury correctly concluded that, given the extent of Alpha's control, Alpha was not negligent in the maintenance and use of the property.

Clifford contends that *Brown* held that a national organization had "a duty for premises liability under similar circumstances." The court in *Brown* said the "[t]his case involves the responsibility of a national organization . . . which provided its name, its credibility, its corporate structure, and its code of conduct to a local branch on a college campus," "effectively handed over a residential building to a group of college students," "should have anticipated that alcohol-related parties on the premises would follow," and

25

"therefore had a duty to exercise reasonable care in providing a reasonably safe environment for any social invitee to an event at the fraternity house." (*Brown, supra*, 118 A.3d at pp. 795-796.) The court further stated that the national organization "had the authority to control its individual members, and actually did so through its implementation and enforcement of its rules and regulations." (*Id.* at p. 796.) Suffice it to say, that *Brown* does not state the rule in California or most states. (See *Barenborg, supra*, 33 Cal.App.5th at pp. 79-80.)

V

*Evidence of Prior Hazing Incidents Involving Alpha and Delta*

Clifford contends that the trial court abused its discretion in denying admission of evidence of prior hazing and alcohol-use complaints involving Alpha chapters at various universities, including Delta at UC Davis.

" 'While the concept "abuse of discretion" is not easily susceptible to precise definition, the appropriate test has been enunciated in terms of whether or not the trial court exceeded " 'the bounds of reason, all of the circumstances before it being considered . . . .' " [Citations.]' [Citation.] 'A decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." [Citations.] In the absence of a clear showing that its decision was arbitrary or irrational, a trial court should be presumed to have acted to achieve legitimate objectives and, accordingly, its discretionary determinations ought not be set aside on review.' [Citation.]" (*Gouskos v. Aptos Village Garage, Inc.* (2001) 94 Cal.App.4th 754, 762 (*Gouskos*); see also *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1419 [" 'A trial court's exercise of discretion in admitting or excluding evidence . . . will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice . . .' "].)

Clifford does not frame an abuse of discretion argument. (*Gouskos, supra*, 94 Cal.App.4th at p. 762.) Clifford lists exhibits regarding specific incidents that he contends should have been admitted, but does not reference the court's rulings on the exhibits in the record, much less explain how the trial court abused its discretion.

Instead, Clifford relies entirely on *Morrison, supra*, 738 So.2d 1105. However, the court in *Morrison* did not order that evidence of specific instances of hazing would be presented at trial but rather that plaintiffs would be limited to nonspecific testimony about the occurrence of hazing. (*Id.* at p. 1112.) In fact, the court considered the fraternity's contention that "plaintiffs inflamed the jury by repeated references to hazing incidents at other universities, evidence which was specifically excluded by the trial court." (*Ibid.*) The *Morrison* court rejected the contention, but only based on its finding that just one such reference occurred at trial, and noting that the trial judge chastised the witness and instructed plaintiffs and their counsel not to allow reference to specific incidents of hazing at other universities. (*Ibid.*)

*Morrison* does not support Clifford's contention that the trial court abused its discretion by not admitting evidence of specific incidents.

VI

*Video Interview of Clifford*

Clifford contends that the trial court erred in admitting his video interview from the Beyond Kink Web site which he asserts was not authenticated, obtained from "a non-existent website," and "altered to create the video admitted into evidence." Clifford further asserts that, under Evidence Code section 352, "[a]ny probative value of this video was clearly and obviously outweighed by it [*sic*] poisonous and infectious prejudice."

When Clifford's counsel first raised the issue of defendants introducing into evidence a "pornographic film" in which Clifford participated, defendants' counsel stated, "we have no intention to offer that evidence unless information about that becomes relevant for impeachment" and "[i]f that were to occur, I would notify counsel, I

would notify the Court, and we would establish whatever relevance and admissibility." The trial court commented that the video "is clearly irrelevant from the get go. But I have no idea what the testimony of your client is going to be." The court also commented that this video evidence is "probably . . . unduly prejudicial" but "I have no idea" and concluded the matter was not properly before the court at that point.

Subsequently, the court took up a motion by defendants to admit the interview portion of the video. Clifford's counsel argued in opposition that the video was "cut and spliced by somebody at the direction of defendant" to make Clifford look like "a lover of a transsexual," and prejudice outweighed the probative value of this evidence under Evidence Code section 352. After reviewing only the transcript of the video interview, the court made a preliminary ruling to admit the evidence.

The court then reviewed Clifford's trial testimony about the video and the video itself "to satisfy myself that it did appear to have substantial probative value to potentially impeach some of the plaintiff's testimony." The court ruled: "It is a close question. [¶] I'm not disagreeing with that, but I think ultimately, the way plaintiff testified, the way the evidence is coming in, in this case; given particularly the timing of the video being so close in time to when the events in this case occurred, I believe its probative value substantially outweighs the potential prejudicial value." The court offered to give a limiting instruction, which defense counsel accepted. As discussed, the court gave the instruction and the video of the interview was played to the jury. Clifford stipulated that he was the person in the video.

Clifford does not direct us to the portion of the record where he objected at trial to the video as unauthenticated and offers only a skeletal argument devoid of citation of authority challenging its admission on appeal. We find no basis for excluding the video as unauthenticated. To be sure, a video must be authenticated before admitted into evidence. (Evid. Code, §§ 250, 1401; *People v. Goldsmith* (2014) 59 Cal.4th 258, 267.) "A photograph or video recording is typically authenticated by showing it is a fair and

accurate representation of the scene depicted. [Citations.] This foundation may, but need not be, supplied by the person taking the photograph or by a person who witnessed the event being recorded. [Citations.] It may be supplied by other witness testimony, circumstantial evidence, content and location. [Citations.]" (*Goldsmith*, at pp. 267-268.) That conflicting inferences can be drawn regarding authenticity goes to the weight of the evidence, not admissibility. (*Id.* at p. 267.)

We conclude the video was properly authenticated. Clifford stipulated that he was the person interviewed in the video. Stutchman testified how the video was downloaded from the Web site and all but the interviews edited out. Clifford asserts that the Web site is "non-existent" but offers no evidence to counter Stutchman's testimony naming the Web site from which he downloaded the video. Likewise, Clifford contends the video was "altered" but again presents no facts or evidence to dispute Stutchman's testimony that the entirety of the interviews with Clifford was included and none of it deleted or edited out.

Clifford contends the video should have been excluded under Evidence Code section 352 as more prejudicial than probative, because his "sexual orientation was not at issue in the case." However, his allegations that he was traumatized by a sexual assault at the Lake Tahoe retreat were at issue. He testified, "I have struggled with dealing with the sexual assault . . . . [¶] And I have a hard time now relating to women and men in general. And in the moment I did something very destructive to myself." Asked what that was, Clifford answered, "I filmed -- I went to San Francisco and filmed pornographic videos to have myself used." He further testified that "the film in San Francisco, that was the only time that I had reached that lowest point in my life."

Clifford opened the door for defendants to impeach this testimony. (See *In re Art T.* (2015) 234 Cal.App.4th 335, 347 [mother's denial that son was a gang member impeached by video where she told detective she knew son was affiliated with gang because he " 'posted . . . all this stupid stuff on Facebook' "]; see also *U.S. v. Garcia* (9th

29

Cir. 2013) 729 F.3d 1171, 1179 [after three prosecution witnesses testified they had never seen shooting victim with a firearm, trial court erred in not admitting photographs from victim's MySpace showing him posing with a sawed-off shotgun].) Moreover, California has a long history of allowing moving picture and video evidence to impeach a plaintiff's claim of injury. (*Heiman v. Market Street Railway Co.* (1937) 21 Cal.App.2d 311, 314-315 (*Heiman*) [court properly admitted moving pictures of plaintiff—who claimed to be an invalid—driving, shopping, carrying bundles, walking, stooping and bending without assistance]; see also *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 454 (*Christ*).)

In arguing prejudice, Clifford refers to the "inflammatory nature of the video" but it consisted of interviews that did not show nudity or depict or discuss sex acts. Clifford had already testified as to the pornographic nature of the film. He further asserts "[t]he intent and effect of this video was to destroy the credibility of Ryan Clifford." But that, of course, is the intent of any impeachment evidence. (*Christ, supra*, 2 Cal.App.5th at p. 455.)

Under Evidence Code section 352, "it is the exclusive province of the trial court to determine whether the probative value of evidence outweighs its possible prejudicial effect. [Citation.] And the trial court's exercise of discretion on this issue will not be disturbed on appeal absent a clear showing of abuse." (*Gouskos, supra*, 94 Cal.App.4th at p. 762.) Clifford has not made this showing.

VII

*Excluding Testimony of Linda Barnard and Mindy Mechanic*

Clifford contends that the trial court abused its discretion in not allowing (1) Dr. Barnard to testify to Clifford's "ongoing treatment for psychological damages" and "the reasonableness and necessity of the treatments," and (2) Dr. Mindy Mechanic to testify to the "psychological context for Plaintiff's delays in reporting the sexual assault/battery . . . and his actions in response to sexual assault/battery that he suffered from on October 17, 2008." Clifford also maintains that exclusion of Drs. Barnard and

30

Mechanic "failed to allow the Plaintiff to counteract the prejudicial value of the Defendants' use of the interview."

The court initially granted defendant's motion in limine to exclude testimony of Dr. Barnard, Clifford's therapist since 2008 designated as a nonretained expert witness, because she refused to waive the psychotherapist-patient privilege at her deposition. Clifford's counsel did not object, stating he did not plan to put on her testimony.

Clifford then sought to call Dr. Barnard for rebuttal testimony to defendants' witness, Dr. Strassberg. The court held expert testimony "is appropriate on rebuttal but for the limited purpose of impeaching the other expert on factual matters." Clifford's counsel made an offer of proof of Dr. Barnard's rebuttal testimony consisting of eight points. The court concluded this proffer was essentially Dr. Barnard being called to express opinions contrary to Dr. Strassberg's and did not permit this testimony.

Code of Civil Procedure section 2034.310, subdivision (b), provides that impeachment by an expert not designated in a party's expert witness list is limited to "testimony to the falsity or nonexistence of any fact used as the foundation for any opinion by any other party's expert witness, but may not include testimony that contradicts the opinion." (See *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 924 ["rather than broadly construing what a foundational 'fact' is, the term should be strictly construed by the trial court to prevent a party from offering a contrary opinion of his expert under the guise of impeachment"].) We review the trial court's exclusion of expert testimony under Code of Civil Procedure section 2034.310, subdivision (b), for abuse of discretion. (*Pina v. County of Los Angeles* (2019) 38 Cal.App.5th 531, 545.)

31

Having reviewed Clifford's proffer, we conclude the trial court did not abuse its discretion.[7]

Clifford represented that Dr. Mechanic would testify generally about "adult trauma, victimization, post traumatic [*sic*] stress disorder (PTSD), sexual violence and psychological abuse." Defendants noticed Dr. Mechanic's deposition for a location in Folsom, California. Clifford failed to respond to e-mails from defendants' counsel seeking confirmation that the deposition would go forward as noticed but did not object. Dr. Mechanic and Clifford failed to appear at the deposition. On the day of the deposition, Ms. Clifford called Sacher's counsel about another matter, claiming ignorance about the deposition but also indicating that Dr. Mechanic was in Los Angeles and would not appear for the deposition.

Defendants filed a motion in limine to exclude Dr. Mechanic's testimony because Clifford failed to produce her for deposition. (Code Civ. Proc., § 2034.300, subd. (d) [excluding expert opinion offered by a party who has "unreasonably failed" to "[m]ake that expert available for deposition"]; Code Civ. Proc., § 2034.420 [deposition of retained expert "shall be taken at a place that is within 75 miles of the courthouse where the action is pending"].)

At the hearing on the motion in limine, Clifford's counsel stated that Dr. Mechanic would testify regarding "sexual assaults among men and how these things manifest themselves" and that Clifford's conduct was "consistent with those that would have been subjected to a sexual assault." Counsel confirmed that Dr. Mechanic did not prepare a report.

---

[7] For example, Clifford's proffer includes: "The only diagnoses given to [Clifford] by long term therapists is PTSD, anxiety and depression. Those are appropriate. Anything else is exaggerated."

32

The court considered whether Dr. Mechanic could be deposed when she arrived to testify at trial and the trial continued, if necessary, for defendants to find an expert to respond to her opinions. Defendants' counsel argued that realistically it would not be possible to take Mechanic's deposition, find a corresponding expert, and have that expert deposed, unless the court continued the trial for two or three weeks. The court ruled, "It just does seem that we're now in trial. Based on the lack of making this retained expert available for deposition with no real good reason, I'm going to grant the defendant's [*sic*] motion to exclude the testimony."

We review this decision for abuse of discretion. (See *Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 950 [a trial court's determination under Code Civ. Proc. § 2034.300 that a party has unreasonably failed to comply with expert discovery requirements is reviewed for abuse of discretion].) Again, Clifford had failed to frame an abuse of discretion argument. (*Gouskos, supra*, 94 Cal.App.4th at p. 762.) Clifford's argument is devoid of citation of authority, including any reference to the relevant provisions of the Code of Civil Procedure. (*Badie v. Bank of America* (1988) 67 Cal.App.4th 779, 784-785.) Clifford does not contest, or even mention, the bases on which the trial court excluded the testimony of Drs. Barnard and Mechanic. By offering nothing but conclusory assertions regarding the exclusion of these witnesses, Clifford has forfeited these claims on appeal. (See *Saltonstall v. City of Sacramento* (2015) 234 Cal.App.4th 549, 587-588 (*Saltonstall*); *Bayramoglu v. Nationstar Mortgage LLC* (2020) 51 Cal.App.5th 726, 737-738 (*Bayramoglu*).)

VIII

*Exclusion of Testimony of Chris Coetzee by CourtCall*

Clifford next asserts that the trial court abused its discretion in failing to permit Dr. Coetzee to testify by CourtCall regarding Clifford's "third surgery and the need for additional surgery to remove the metal hardware from [Clifford's] injured foot."

On the second day of trial, Clifford filed a motion for Dr. Coetzee to appear by CourtCall. Clifford cited provisions of the California Rules of Court[8] allowing (1) a party to appear at court proceedings by telephone if the court determines that a telephone appearance is appropriate (Rule 3.670(f)(3)) and (2) a nonparty deponent to appear at a deposition by telephone (Rule 3.1010(d)). Clifford also argued that the trial court has inherent discretion to control its proceedings. Clifford quoted but did not cite an unpublished adoption case that telephonic testimony was not a " 'novel procedure in California.' " Clifford also cited a federal rule requiring a showing of good cause in compelling circumstances for testimony transmitted from another location.

In opposition, defendants attested that Clifford had designated Dr. Coetzee as a nonretained expert witness, noticed his deposition in Minnesota, served an amended notice changing the date of the deposition, and then cancelled the deposition.

The trial court expressed doubt that it had discretion to allow telephonic testimony of an expert witness, but assuming such discretion existed, the court said, "I don't find there is any good cause for any basis. I further find that it would be substantially prejudicial to the defense to have a disembodied voice testify to this jury and not be able to have the jury size up the witness and allow the defense to cross-examine him in person." The court denied the motion.

Clifford then proposed that Dr. Coetzee be deposed by telephone. Defense counsel responded that it would be impossible to question Dr. Coetzee about exhibits by telephone and very difficult to do so by video. Counsel also pointed out that Clifford had declared himself ready for trial, which was followed by a three-week interval while the case was reassigned, during which Clifford could have arranged for Dr. Coetzee's deposition in Minnesota. The court suggested that Dr. Coetzee fly out for a videotaped

---

[8] All references to rules are to the California Rules of Court.

deposition that could be presented to the jury, but Clifford's counsel responded that Clifford could not afford it.[9]

"California encourages telephonic appearances in civil cases as a way of improving access to the courts and reducing litigation costs." (*Davis v. Superior Court* (2020) 50 Cal.App.5th 607, 616, citing Rule 3.670(a) & (f)(1).) "Personal appearances are required for certain matters, such as '[t]rials, hearings, and proceedings at which witnesses are expected to testify . . . .' " (*Davis*, at p. 617, quoting Rule 3.670(e)(1)(A).) "The court, however, has discretion to permit a telephonic appearance in lieu of a personal appearance." (*Davis*, at p. 617, citing Rule 3.670(f)(3).) "Conversely, the court may require a personal appearance if the court determines 'on a hearing-by-hearing basis that a personal appearance would materially assist in the determination of the proceedings . . . .' " (*Davis*, at p. 617, quoting Rule 3.670(f)(2).)

As Rule 3.670 indicates, we review for abuse of discretion the trial court's exercise of its authority to permit telephonic testimony. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1176.) Here, the court found the defense would be prejudiced if the jury was not able to view the witness's demeanor and the defense could not cross-examine him in person. It was well within the court's discretion to make that determination. (See *Nada*, at p. 1176 [no abuse of discretion where court expressed concern about the reliability of telephonic testimony of witnesses and refused to permit presentation of evidence in this format]; see also Evid. Code, § 711 ["At the trial of an action, a witness can be heard only in the presence and subject to the examination of all parties to the action, if they choose to attend and examine"]; Evid. Code, § 780 [trier of

---

[9] Clifford also submitted an unsworn "background" statement from his counsel that the Yolo County Superior Court had previously approved the presentation of Dr. Coetzee's testimony at trial by CourtCall. "It is axiomatic that the unsworn statements of counsel are not evidence." (*In re Zeth S.* (2003) 31 Cal.4th 396, 413-414, fn. 11; *In re Alexandria P.* (2016) 1 Cal.App.5th 331, 342, fn. 8.)

35

fact to determine "the credibility of a witness," inter alia, by his or her "demeanor while testifying and the manner in which he testifies"]; CACI No. 107 [in deciding whether to believe a witness that the jury may consider "[h]ow did the witness look, act, and speak while testifying"].)

IX

*Economic and Noneconomic Damages Award*

Clifford contends that the jury's award of damages set forth in the special verdict was not supported by substantial evidence. Clifford splits this claim into two parts that essentially make the same contention: (1) the jury ignored "uncontested evidence of injuries causing damages" to Clifford, and (2) the jury failed to properly compensate Clifford because the special verdict did not include "undisputed damages" and provided "inadequate damages."

Clifford's "uncontested evidence" consists of a chart of the damages he claimed and a reference to his posttrial motions where the same chart appears. This is not evidence. (See *Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 590 ["Matters set forth in points and authorities are not evidence"].)

Clifford's argument that the jury did not properly compensate him consists of conclusory assertions that "[t]he undisputed evidence was Plaintiff suffered a permanent 'serious' and life-altering injury to his right foot as a result of the allegations resulting from this case," and the jury found Delta "guilty of negligence as a result of the November 5, 2008, incident at the fraternity house . . . ."

Clifford's assertions fail to properly submit the damages issue for appellate review. (*Saltonstall, supra*, 234 Cal.App.4th at pp. 587-588; *Bayramoglu, supra*, 51 Cal.App.5th at pp. 737-738.)

In any event, reviewing the record, we conclude the special verdict on economic and noneconomic damages was supported by substantial evidence.

36

"Damages, even economic damages, are difficult to measure in personal injury cases. There may be disputed facts regarding the amount of medical expenses or lost wages, or disputed inferences about the probable course of events such as the length of incapacitation or whether a continuing disability will worsen, plateau, or improve." (*Abbott v. Taz Express* (1998) 67 Cal.App.4th 853, 856-857 (*Abbott*).) "The common law in its wisdom has left these inherently subjective decisions regarding damages with the jury as the trier of fact to apply its collective experience, common sense, and diverse backgrounds. As a further safeguard, the trial judge has considerable discretion to review excessive or inadequate damage awards in conjunction with a motion for new trial." (*Abbott*, at p. 857; *J.P. v. Carlsbad Unified School Dist.* (2014) 232 Cal.App.4th 323, 341-342 (*J.P.*) [" 'It is for the jury to determine the probabilities as to whether future detriment is reasonably certain to occur in any particular case' "].) Here, the trial court denied Clifford's motion for a new trial.

The measure of noneconomic damages is a fact question " 'first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial.' " (See *Burchell v. Faculty Physicians & Surgeons of Loma Linda University School of Medicine* (2020) 54 Cal.App.5th 515, 527 (*Burchell*), quoting *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506.) "Determining the amount of money a plaintiff is to be awarded as compensation for noneconomic injuries is '[o]ne of the most difficult tasks imposed on a fact finder.' [Citation.] 'The inquiry is inherently subjective and not easily amenable to concrete measurement.' [Citation.] Naturally, therefore, the appropriate amount of noneconomic damages is ' "a matter on which there legitimately may be a wide difference of opinion." ' [Citation.]" (*Burchell*, at p. 527.)

Our role is to " 'review the jury's damages award for substantial evidence, giving due deference to the jury's verdict and the trial court's denial of the new trial motion.' [Citation.] We 'must determine every conflict in the evidence in respondent's favor, and

37

must give him the benefit of every inference reasonably drawn from the record.' " (*Burchell, supra*, 54 Cal.App.5th at p. 527; *J.P., supra*, 232 Cal.App.4th at p. 341.)

Beginning with economic damages, Clifford's first component of these damages claims is $49,216 for past medical expenses. This amount was stipulated by the parties and awarded by the jury. Next is $8,000 described as money lost to UC Davis. There was no evidence at trial pertaining to this claim and Clifford does not explain it on appeal. This component was not on the special verdict form so the jury made no award in this category.

Clifford claims $54,358 in past lost household services and $300,545 in future lost household services. The jury awarded $3,500 for past lost household services and zero for future lost household services. Clifford's expert, Jouganatos, derived those numbers by applying Clifford's statement that his ability to perform such services was permanently diminished by 50 percent to a database. The jury was entitled to make its own determination. "A trier of fact is not bound by the exact value of nontechnical services announced by an expert, but ' "may fix the value . . . bringing to bear [its] own general knowledge and is not necessarily bound by express evidence of the value of the services performed." ' [Citation.]" (*Abbott, supra*, 67 Cal.App.4th at p. 857.)

Clifford claims $180,000 in past lost earnings calculated as $45,000 per year for four years. The jury awarded zero damages for this component. Jouganatos admitted on cross-examination that he derived this amount solely from Clifford's statement that he was unable work for four years because of his foot injury. Jouganatos, however, testified that "having a four-year degree from UC California [*sic*] [Clifford] is quite employable." On cross-examination, Clifford admitted that the surgeon who performed the first two surgeries, Dr. Greene, told Clifford that six weeks after completing physical therapy he could resume normal activities. (Haning et al., Cal. Practice Guide: Personal Injury (The Rutter Group 2020) ¶ 3:558 ["the treating physician should be called to testify to the amount of time that will be required for plaintiff to recover and therefore be in *physical*

38

*shape* to perform the intended work. Otherwise, the trier of fact will be unable realistically to determine when employment should have commenced"].) Further, Clifford testified that during the four-year period he claims he was unable to work he was doing unpaid computer work for his father's construction company.

From this evidence, the jury could determine that Clifford was not prevented by injury from working a job for which he was qualified, and, accordingly, award zero damages for past lost earnings.

Regarding noneconomic damages, Clifford requested (1) $693,750 to $925,000 for past pain and suffering and loss of enjoyment calculated as $75,000 to $100,000 per year for 9.25 years, and (2) future pain and suffering and loss of enjoyment of $2.3 million to $3.45 million calculated as $50,000 to $75,000 per year for 46 years. These numbers were suggested in closing argument by defense counsel, who acknowledged that "[p]ain and suffering is probably the most difficult aspect of any case because that's kind of— what's it worth to be disabled." The jury awarded $100,000 for past physical pain and mental suffering for Clifford's foot injury and $50,000 for future physical pain and suffering.

Virtually all evidence supporting noneconomic damages came from the testimony of Clifford and Ms. Clifford. While Clifford was "in the best position to give the most *detailed* testimony on this issue" (Haning et al., Cal. Practice Guide: Personal Injury, *supra*, ¶ 3:621), a trier of fact "is likely to perceive plaintiff's testimony as self-serving and biased." (*Id.*, ¶ 3:622.) Ms. Clifford corroborated Clifford's account, but "the closer the relationship between witness and plaintiff, the less objective the testimony and the less weight the jurors are likely to give that testimony." (*Id.*, ¶ 3:640.)

Defendants presented evidence inconsistent with Clifford's claim of physical pain. Clifford testified that he regularly walked with a cane because he had fallen and had to walk with a limp on his heel to lessen the pain. The jury was shown a surveillance video taken shortly before trial of Clifford walking into a hotel and walking out. The

investigator testified that Clifford walked in without a cane and walked out with a cane but not limping. Clifford confirmed that he was at the hotel to meet with his attorney. Clifford contradicted the investigator and testified his limp does not always show and he does not always need a cane. However, the jury was entitled to consider video surveillance in determining the amount of an award for noneconomic damages. (*Heiman, supra*, 21 Cal.App.2d at pp. 314-315; *Christ, supra*, 2 Cal.App.5th at p. 454; see also *Culbertson v. R.D. Werner Co., Inc.* (1987) 190 Cal.App.3d 704, 706 ["investigation films show[ed] plaintiff engaging in strenuous activities which were inconsistent with his claimed injuries"].) This evidence, which Clifford has failed to discuss, showed that his claim for noneconomic damages was out of proportion to the pain and suffering he experienced. (*Rayii, supra*, 218 Cal.App.4th at p. 1416.)

We conclude that the jury's award of economic and noneconomic damages was supported by substantial evidence.

X

*Net Judgment*

The court entered a net judgment of $38,735.95 in favor of Clifford against Delta and $33,259.03 in favor of Alpha against Clifford.

Clifford contends that the trial court abused its discretion in reducing the judgment by combining the verdicts against Delta and Alpha in the judgment and by awarding costs to Alpha that were not allowable or could not be differentiated from Delta's costs. Clifford misstates the record, which he does not cite.

Clifford contends that Delta did not obtain a more favorable result than its settlement offer of $150,000 under Code of Civil Procedure section 998, because the jury's total damages award was $202,716. However, the jury found Delta liable only for negligence and premises liability regarding the events of November 5, 2008. The jury found Delta 40 percent responsible for negligence and 50 percent responsible for premises liability for Clifford's harm. In the proposed judgment, the trial court initially

40

calculated damages against Delta in the amount of $81,806 and zero against Alpha. After Clifford and defendants filed responses and objections to the proposed judgment, the trial court issued a judgment recalculating Clifford's damages as $141,901.20 against Delta and zero against Alpha.

Delta filed a motion to vacate the judgment on various grounds, including an offset under Code of Civil Procedure section 877 for Sacher's good faith settlement. The trial court granted the motion in part, ruling that the judgment would be corrected to reflect that Delta was responsible for a 40 percent share of the award of $150,000 to Clifford for noneconomic damages. The court further ruled that Delta was entitled to an offset of $49,407.60 under Code of Civil Procedure section 877, reducing Delta's proportionate share of economic damages of $52,716 by $49,407.60 to yield an economic damages award of $3,308.40.

Thus, the combined economic and noneconomic damages award to Clifford against Delta as determined by the trial court was not $202,716 but considerably less than Delta's offer of $150,000. Clifford does not acknowledge, discuss or cite the record regarding the court's rulings, or offer argument and authority elucidating how he contends the court abused its discretion. We conclude Delta was entitled to an award of costs allowable under Code of Civil Procedure section 998.

Next, Clifford contends that Delta and Alpha put on a joint defense, therefore, because Delta was not entitled to costs, neither was Alpha. Alpha and Delta filed a joint brief in support of costs under Code of Civil Procedure section 998 to both Alpha and Delta, costs to Alpha as prevailing party, and a deduction of Delta's costs from the damages award. In its order, the trial court noted that the motion was unopposed. The court reviewed defendants' joint memorandum of costs submitted with the motion and provided a detailed calculation and allocation of costs awarded to Alpha and Delta.

We have no basis on which to question the court's determination of costs, including separate cost awards to Alpha and Delta, not the least because Clifford filed no

41

opposition to the motion below.  (*Field-Escandon v. DeMann* (1988) 204 Cal.App.3d 228, 239 [landowner who failed to raise objection to cost award in the lower court waived any right to challenge the award on appeal].)[10]

## DISPOSITION

The judgment is affirmed.  Defendants shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


                                                   /s/
                                      RAYE, P. J.


We concur:


      /s/
BLEASE, J.


      /s/
HOCH, J.

---

[10] Clifford requests judicial notice of documents from 2020 that he argues are relevant because they show that Alpha controlled Delta, Alpha and Delta were one entity, and hazing occurred at Delta during the time period relevant to this case.   In opposition, defendants assert, inter alia, that nothing in the documents refers to the events at issue, which occurred more than 11 years before.  We agree with defendants.  Defendants also requested a hearing on the request for judicial notice.  We deferred ruling on Clifford's request for judicial notice and defendants' request for a hearing and now deny both.